380 F.2d 385
 UNITED STATES of America and Linda Stout, by her father and
next friend, Blevin Stout, Appellant,
v.
JEFFERSON COUNTY BOARD OF EDUCATION et al., Appellees.
UNITED STATES of America, Appellant,
v.
The BOARD OF EDUCATION OF the CITY OF FAIRFIELD et al., Appellees.
UNITED STATES of America, Appellant,
v.
The BOARD OF EDUCATION OF the CITY OF BESSEMER et al., Appellees.
UNITED STATES of America, Appellant,
v.
CADDO PARISH SCHOOL BOARD et al., Appellees.
UNITED STATES of America, Appellant,
v.
The BOSSIER PARISH SCHOOL BOARD et al., Appellees.
Margaret M. JOHNSON et al., Appellants,
v.
JACKSON PARISH SCHOOL BOARD et al., Appellees.
Yvornia Decarol BANKS et al., Appellants,
v.
CLAIBORNE PARISH SCHOOL BOARD et al., Appellees.
Jimmy ANDREWS et al., Appellant,
v.
CITY OF MONROE, LOUISIANA et al., Appellees.
Clifford Eugene DAVIS, Jr., et al., Appellants,
v.
EAST BATON ROUGE PARISH SCHOOL BOARD et al., Appellees.
 Nos. 23345, 23331, 23335, 23274, 23365, 23173, 23192, 23253, 23116.
 United States Court of Appeals Fifth Circuit.
 March 29, 1967. Dissenting Opinion June 27, 1967,
March 29, 1967, See 88 S.Ct. 72, 77.
 
 Macon L. Weaver, U.S. Atty., Birmingham, Ala., Norman C. Amaker, New York City, David L. Norman, Atty., Dept. of Justice, Washington, D.C., William G. Somerville, Jr., Birmingham, Ala., John Doar, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Nicholas deB. Katzenbach, Atty. Gen., Brian K. Landsberg, Leroy D. Clark, Alfred Feinberg, New York City, Vernon Z. Crawford, Mobile, Ala., John H. Ruffin, Jr., Augusta, Ga., Howard Moore, Jr., Atlanta, Ga., St. John Barrett, Joel M. Finkelstein, Charles R. Nesson, Elihu Leifer, Attys., Dept. of Justice, Washington, D.C., Orzell Billingsley, Jr., Birmingham, Ala., David H. Hood, Jr., Bessemer, Ala., Jesse N. Stone, Jr., Shreveport, La., A. P. Tureaud, New Orleans, La., Johnnie Jones, Baton Rouge, La., Jack Greenberg, James M. Nabrit, III, Michael Meltsner, Henry Aronson, Charles H. Jones, Jr., New York City, Oscar W. Adams, Jr., Demetrius C. Newton, Birmingham, Ala., Sheila Rush Jones, Conrad K. Harper, Fred Wallace, New York City, Gerald A. Smith, Baltimore, Md., of counsel, for appellants and intervenors.
 Maurice F. Bishop, Birmingham, Ala., John C. Satterfield, Yazoo City, Miss., for appellees.
 No. 23331:
 Macon L. Weaver, U.S. Atty., Demetrius C. Newton, Orzell Billingsley, Jr., Birmingham, Ala., David L. Norman, Atty., Dept. of Justice, Washington, D.C., William G. Somerville, Jr., Birmingham, Ala., John Doar, Asst. Atty. Gen., Nicholas deB. Katzenbach, Atty. Gen., Brian K. Landsberg, St. John Barrett, Elihu Leifer, Joel Finkelstein, Attys., Dept. of Justice, Washington, D.C., Jack Greenberg, James M. Nabrit, III, Michael Meltsner, Leroy D. Clark, Norman C. Amaker, Alfred Feinberg, Henry Aronson, New York City, David H. Hood, Jr., Bessemer, Ala., Jesse N. Stone, Jr., Shreveport, La., A. P. Tureaud, New Orleans, La., Vernon Z. Crawford, Mobile, Ala., Oscar W. Adams, Jr., Birmingham, Ala., Johnnie Jones, baton Rouge, La., John H. Ruffin, Jr., Augusta, Ga., Howard Moore, Jr., Atlanta, Ga., Sheila Rush Jones, Conrad K. Harper, Fred Wallace, New York City, Gerald A. Smith, Baltimore, Md., of counsel, for appellants and intervenors.
 Maurice F. Bishop, Birmingham, Ala., John C. Satterfield, Yazoo City, Miss., for appellees.
 No. 23335:
 Macon L. Weaver, U.S. Atty., Birmingham, Ala., David L. Norman, Atty., Dept. of Justice, Washington, D.C., Oscar W. Adams, Jr., William G. Somerville, Jr., Birmingham, Ala., John Doar, Asst. Atty. Gen., Dept. of Justice, Civil Rights Div., Washington, D.C., Nicholas deB. Katzenbach, Atty. Gen., St. John Barrett, Brian K. Landsberg, Attys., Dept. of Justice, Washington, D.C., Elihu Leifer, Joel Finkelstein, Attys., Dept. of Justice, Washington, D.C., Jack Greenberg, James M. Nabrit, III, Michael Meltsner, Leroy D. Clark, Norman C. Amaker, Henry Aronson, Charles H. Jones, Jr., Alfred Feinberg, New York City, David H. Hood, Jr., Bessemer, Ala., Jesse N. Stone, Jr., Shreveport, La., A. P. Tureaud, New Orleans, La., Vernon Z. Crawford, Mobile, Ala., Oscar W. Adams, Jr., Birmingham, Ala., Demetrius C. Newton, Orzell Billingsley, Jr., Birmingham, Ala., Johnnie Jones, Baton Rouge, La., John H. Ruffin, Jr., Augusta, Ga., Howard Moore, Jr., Atlanta, Ga., Sheila Rush Jones, Conrad K. Harper, Fred Wallace, New York City, Gerald A. Smith, Baltimore, Md., of counsel, for appellants and intervenors.
 Reid B. Barnes, Birmingham, Ala., John C. Satterfield, Yazoo City, Miss., Lange, Simpson, Robinson & Somerville, Birmingham, Ala., J. Howard McEniry, Jr., McEniry, McEniry & McEniry, Bessemer, Ala., for appellees.
 
 No. 23274:
 
 1
 David L. Norman, Atty., Dept. of Justice, Washington, D.C., Norman C. Amaker, Charles H. Jones, Jr., New York City, A. P. Tureaud, New Orleans, La., John Doar, Asst. Atty. Gen., Dept of Justice, Civil Rights Div., Washington, D.C., Edward L. Shaheen, U.S. Atty., St. John Barrett, Alexander C. Ross, Elihu Leifer, Joel Finkelstein, Attys., Dept. of Justice, Washington, D.C., David H. Hood, Jr., Bessemer, Ala., Jesse N. Stone, Jr., Shreveport, La., Johnnie Jones, Baton Rouge, La., Jack Greenberg, James M. Nabrit, III, Michael Meltsner, Henry Aronson, New York City, Oscar W. Adams, Jr., Demetrius C. Newton, Birmingham, Ala., Leroy D. Clark, Alfred Feinberg, New York City, Vernon Z. Crawford, Mobile, Ala., John H. Ruffin, Jr., Augusta, Ga., Howard Moore, Jr., Atlanta, Ga., Sheila Rush Jones, Conrad K. Harper, Fred Wallace, New York City, Gerald A. Smith, Baltimore, Md., of counsel, for appellants and intervenors.
 
 
 2
 William P. Schuler, 2nd Asst. Atty. Gen. of La., Arabi, La., John A. Richardson, Shreveport, La., Jack P. F. Gremillion, Atty. Gen. of La., Louis H. Padgett, Dist Atty., 26th Judicial Dist., Bossier City, La., Fred L. Jackson, Dist. Atty., Second Judicial Dist., Homer La., for appellees.
 
 No. 23365:
 
 3
 David L. Norman, Atty., Dept. of Justice, Washington, D.C., James M. Nabrit, III, New York City, John Doar, Asst. Atty. Gen., Dept. of Justice, Civil Rights Div., Washington, D.C., Edward L. Shaheen, U.S. Atty., St. John Barrett, Elihu I. Leifer, Joel Finkelstein, Attys., Dept. of Justice, Washington, D.C., Jesse N. Stone, Jr., Shreveport, La., Jack Greenberg, Norman C. Amaker, Michael Meltsner, Leroy D. Clark, New York City, David H. Hood, Jr., Bessemer, Ala., Jesse N. Stone, Jr., Shreveport, La., A. P. Tureaud, New Orleans, La., Henry Aronson, Charles H. Jones, Jr., New York City, Vernon Z. Crawford, Mobile, Ala., Oscar W. Adams, Jr., Demetrius C. Newton, Birmingham, Ala., Johnnie Jones, Baton Rouge, La., John H. Ruffin, Jr., Augusta, Ga., Howard Moore, Jr., Atlanta, Ga., Conrad K. Harper, New York City, Gerald A. Smith, Baltimore, Md., Alfred Feinberg, New York City, of counsel, for intervenors and appellants.
 
 
 4
 J. Bennett Johnston, Jr., Shreveport, La., Jack P. F. Gremillion, Atty. Gen., State of La., Baton Rouge, La., William P. Schuler, Asst. Atty. Gen., State of La., Louis H. Padgett, Jr., Dist. Atty., Bossier Parish, La., Fred L. Jackson, Dist. Atty., Second Judicial Dist., Homer, La., John A. Richardson, Dist. Atty., First Judicial Dist., Shreveport, La., for appellees.
 
 No. 23273:
 
 5
 Alvin J. Bronstein, Jackson, Miss., Harris David, New Orleans, La., Carl Rachlin, New York City, David Norman, Atty., Dept. of Justice, Washington, DC., John Doar, Asst. Atty. Gen., Dept. of Justice, Civil Rights Div., Washington, D.C., Edward L. Shaheen, U.S. Atty., St. John Barrett, Frank M. Dunbaugh, Albert S. Pergam, Attys., Department of Justice, Washington, D.C., Elihu Leifer, Joel Finkelstein, Attys., Dept. of Justice, Washington, D.C., Jesse N. Stone, Jr., Shreveport, La., James Sharp, Jr., Monroe, La., William Q. Keenan, New York City, Robert F. Collins, Nils R. Douglas, Lolis E. Elie, New Orleans, La., for appellants.
 
 
 6
 Fred L. Jackson, Dist. Atty., Homer, La., William H. Baker, Jonesboro, La., Teddy W. Airhart, Jr., Asst. Atty. Gen. of La., Baton Rouge, La., Jack P. F. Gremillion, Atty. Gen. of La., Baton Rouge, La., Louis H. Padgett, Jr., Dist. Atty., Twenty-Sixth Judicial Dist., Bossier City, La., William P. Schuler, 2nd Asst. Atty. Gen. of La., John A. Richardson, Dist. Atty., First Judicial Dist., Shreveport, La., for appellees.
 
 No. 23192:
 
 7
 Alvin J. Bronstein, Jackson, Miss., Carl Rachlin, New York City, Harris David, Robert F. Collins, New Orleans, La., John Doar, Asst. Atty. Gen., Dept. of Justice, Civil Rights Div., Washington, D.C., Edward L. Shaheen, U.S. Atty., St. John Barrett, David L. Norman, Elihu I. Leifer, Joel Finkelstein, Attys., Dept. of Justice, Washington, D.C., Jesse N. Stone, Jr., Shreveport, La., James Sharp, Jr., Monroe, La., William Q. Keenan, New York City, Robert F. Collins, Nils R. Douglas, Lolis E. Elie, New Orleans, La., for appellants and intervenors.
 
 
 8
 William P. Schuler, Arabi, La., Jack P. F. Gremillion, Atty. Gen. of La., Thomas McFerrin, Sr., Harry Kron, Jr., Asst. Atty. Gen., Baton Rouge, La., Fred L. Jackson, Homer, La., Teddy W. Airhart, Jr., Asst. Atty. Gen., Baton Rouge, La., Louis H. Padgett, Jr., Dist. Atty., Twenty-Sixth Judicial Dist., Bossier City, La., John A. Richardson, Dist. Atty., First Judicial Dist., Shreveport, La., for appellees.
 
 No. 23253:
 
 9
 Alvin J. Bronstein, Jackson, Miss., Stanley E. Tolliver, Cleveland, Ohio, William Q. Keenan, New York City, James M. Nabrit, III, New York City, Jesse N. Stone, Jr., Shreveport, La., James Sharp, Jr., Monroe, La., Carl Rachlin, William Q. Keenan, New York City, Robert F. Collins, Nils R. Douglas, Lolis E. Elie, New Orleans, La., for appellants and intervenors.
 
 
 10
 William F. Pipes, Jr., Albin P. Lassiter, Dist. Atty., Monroe, La., Harold B. Judell, New Orleans, La., William P. Schuler, Arabi, La., for appellees.
 
 No. 23116:
 
 11
 A. P. Tureaud, New Orleans, La., Norman C. Amaker, James M. Nabrit, III, New York City, Michael Meltsner, Leroy D. Clark, Henry Aronson, Charles H. Jones, Jr., New York City, Alfred Feinberg, New York City, David H. Hood, Jr., Bessemer, Ala., Jesse N. Stone, Jr., Shreveport, La., A. P. Tureaud, New Orleans, La., Vernon Z. Crawford, Mobile, Ala., Oscar W. Adams, Jr., Birmingham, Ala., Demetrius C. Newton, Birmingham, Ala., Johnnie Jones, Baton Rouge, La., John H. Ruffin, Jr., Augusta, Ga., Howard Moore, Jr., Atlanta, Ga., Jack Greenberg, New York City, Johnnie Jones, Baton Rouge, La., Robert Belton, Conrad K. Harper, New York City, of counsel, for appellants and intervenors.
 
 
 12
 John F. Ward, Jr., Baton Rouge, La., William P. Schuler, Arabi, La., Burton, Roberts & Ward, Baton Rouge, La., for appellees.
 
 
 13
 ON PETITIONS FOR REHEARING EN BANC.
 
 
 14
 Before TUTTLE, Chief Judge, and BROWN, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER and SIMPSON, Circuit Judges.
 
 PER CURIAM:
 
 15
 1. The Court sitting en banc adopts the opinion and decree filed in these cases December 29, 1966, subject to the clarifying statements in this opinion and the changes in the decree attached to this opinion.
 
 
 16
 2. School desegregation cases involve more than a dispute between certain Negro children and certain schools. If Negroes are ever to enter the mainstream of American life, as school children they must have equal educational opportunities with white children.
 
 
 17
 3. The Court holds that boards and officials administering public schools in this circuit[1] have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools-- just schools. Expressions in our earlier opinions distinguishing between integration and desegregation[2] must yield to this affirmative duty we now recognize. In fulfilling this duty it is not enough for school authorities to offer Negro children the opportunity to attend for merly all-white schools. The necessity of overcoming the effects of the dual school system in this circuit requires integration of faculties, facilities, and activities, as well as students. To the extent that earlier decisions of this Court (more in the language of the opinions, than in the effect of the holdings) conflict with this view, the decisions are overruled. We refer specifically to the cases listed in footnote 3 of this opinion.[3]
 
 
 18
 4. Freedom of choice is not a goal in itself. It is a means to an end. A schoolchild has no inalienable right to choose his school. A freedom of choice plan is but one of the tools available to school officials at this stage of the process of converting the dual system of separate schools for Negroes and whites into a unitary system. The governmental objective of this conversion is-- educational opportunities on equal terms to all. The criterion for determining the validity of a provision in a school desegregation plan is whether the provision is reasonably related to accomplishing this objective.
 
 
 19
 5. The percentages peferred to in the Guidelines and in this Court's decree are simply a rough rule of thumb for measuring the effectiveness of freedom of choice as a useful tool. The percentages are not a method for setting quotas or striking a balance. If the plan is ineffective, longer on promises than performance, the school officials charged with initiating and administering a unitary system have not met the constitutional requirements of the Fourteenth Amendment; they should try other tools.
 
 
 20
 6. In constructing the original and revised decrees, the Court gave great weight to the 1965 and 1966 HEW Guidelines. These Guidelines establish minimum standards clearly applicable to disestablishing state-sanctioned segregation. These Guidelines and our decree are within the decisions of this Court, comply with the letter and spirit of the Civil Rights Act of 1964, and meet the requirements of the United States Constitution. Courts in this circuit should give great weight to future HEW Guidelines, when such guidelines are applicable to this circuit and are within lawful limits. We express no opinion as to the applicability of HEW Guidelines in racially imbalanced situations such as occur in some other circuits where it is contended that state action may be found in state tolerance of de facto segregation or in such action as the drawing of attendance boundaries based on a neighborhood school system.
 
 
 21
 The Court reaffirms the reversal of the judgments below and the remand of each case for entry of the decree attached to this opinion.
 
 
 22
 The mandate will issue immediately.
 
 
 23
 CORRECTED DECREE.
 
 
 24
 It is ORDERED, ADJUDGED and DECREED that the defendants, their agents, officers, employees and successors and all those in active concert and participation with them, be and they are permanently enjoined from discriminating on the basis of race or color in the operation of the school system. As set out more particularly in the body of the decree, they shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system:
 
 I.
 SPEED OF DESEGREGATION
 
 25
 Commencing with the 1967-68 school year, in accordance with this decree, all grades, including kindergarten grades, shall be desegregated and pupils assigned to schools in these grades without regared to race or color.
 
 II.
 EXERCISE OF CHOICE
 
 26
 The following provisions shall apply to all grades:
 
 
 27
 (a) Who May Exercise Choice. A choice of schools may be exercised by a parent or other adult person serving as the student's parent. A student may exercise his own choice if he (1) is exercising a choice for the ninth or a higher grade, or (2) has reached the age of fifteen at the time of the exercise of choice. Such a choice by a student is controlling unless a different choice is exercised for him by his parent or other adult person serving as his parent during the choice period or at such later time as the student exercises a choice. Each reference in this decree to a student's exercising a choice means the exercise of the choice, as appropriate, by a parent or such other adult, or by the student himself.
 
 
 28
 (b) Annual Exercise of Choice. All students, both white and Negro, shall be required to exercise a free choice of schools annually.
 
 
 29
 (c) Choice Period. The period for exercising choice shall commence May 1, 1967 and end June 1, 1967, and in subsequent years shall commence March 1 and end March 31 preceding the school year for which the choice is to be exercised. No student or prospective student who exercises his choice within the choice period shall be given any preference because of the time within the period when such choice was exercised.
 
 
 30
 (d) Mandatory Exercise of Choice. A failure to exercise a choice within the choice period shall not preclude any student from exercising a choice at any time before he commences school for the year with respect to which the choice applies, but such choice may be subordinated to the choices of students who exercised choice before the expiration of the choice period. Any student who has not exercised his choice of school within a week after school opens shall be assigned to the school nearest his home where space is available under standards for determining available space which shall be applied uniformly throughout the system.
 
 
 31
 (e) Public Notice. On or within a week before the date the choice period opens, the defendants shall arrange for the conspicuous publication of a notice describing the provisions of this decree in the newspaper most generally circulated in the community. The text of the notice shall be substantially similar to the text of the explanatory letter sent home to parents. Publication as a legal notice will not be sufficient. Copies of this notice must also be given at that time to all radio and television stations located in the community. Copies of this decree shall be posted in each school in the school system and at the office of the Superintendent of Education.
 
 
 32
 (f) Mailing of Explanatory Letters and Choice Forms. On the first day of the choice period there shall be distributed by first-class mail an explanatory letter and a choice form to the parent (or other adult person acting as parent, if known to the defendants) of each student, together with a return envelope addressed to the Superintendent. Should the defendants satisfactorily demonstrate to the court that they are unable to comply with the requirement of distributing the explanatory letter and choice form by first-class mail, they shall propose an alternative method which will maximize individual notice, e.g., personal notice to parents by delivery to the pupil with adequate procedures to insure the delivery of the notice. The text for the explanatory letter and choice form shall essentially conform to the sample letter and choice form appended to this decree.
 
 
 33
 (g) Extra Copies of the Explanatory Letter and Choice Form. Extra copies of the explanatory letter and choice form shall be freely available to parents, students, prospective students, and the general public at each school in the system and at the office of the Superintendent of Education during the times of the year when such schools are usually open.
 
 
 34
 (h) Content of Choice Form. Each choice form shall set forth the name and location and the grades offered at each school and may require of the person exercising the choice the name, address, age of student, school and grade currently or most recently attended by the student, the school chosen, the signature of one parent or other adult person serving as parent, or where appropriate the signature of the student, and the identity of the person signing. No statement of reasons for a particular choice, or any other information, or any witness or other authentication, may be required or requested, without approval of the court.
 
 
 35
 (i) Return of Choice Form. At the option of the person completing the choice from, the choice may be returned by mail, in person, or by messenger to any school in the school system or to the office of the Superintendent.
 
 
 36
 (j) Choices not on Official Form. The exercise of choice may also be made by the submission in like manner of any other writing which contains information sufficient to identify the student and indicates that he has made a choice of school.
 
 
 37
 (k) Choice Forms Binding. When a choice form has once been submitted and the choice period has expired, the choice is binding for the entire school year and may not be changed except in cases of parents making different choices from their children under the conditions set forth in paragraph II (a) of this decree and in exceptional cases where, absent the consideration of race, a change is educationally called for or where compelling hardship is shown by the student. A change in family residence from one neighborhood to another shall be considered an exceptional case for purposes of this paragraph.
 
 
 38
 (l) Preference in Assignment. In assigning students to schools, no preferences shall be given to any student for prior attendance at a school and, except with the approval of court in extraordinary circumstances, no choice shall be denied for any reason other than overcrowding. In case of overcrowding at any school, preference shall be given on the basis of the proximity of the school to the homes of the students choosing it, without regard to race or color. Standards for determining overcrowding shall be applied uniformly throughout the system.
 
 
 39
 (m) Second Choice where First Choice is Denied. Any student whose choice is denied must be promptly notified in writing and given his choice of any school in the school system serving his grade level where space is available. The student shall have seven days from the receipt of notice of a denial of first choice in which to exercise a second choice.
 
 
 40
 (n) Transportation. Where transportation is generally provided, buses must be routed to the maximum extent feasible in light of the geographic distribution of students, so as to serve each student choosing any school in the system. Every student choosing either the formerly white or the formerly Negro school nearest his residence must be transported to the school to which he is assigned under these provisions, whether or not it is his first choice, if that school is sufficiently distant from his home to make him eligible for transportation under generally applicable transportation rules.
 
 
 41
 (o) Officials not to Influence Choice. At no time shall any official, teacher, or employee of the school system influence any parent, or other adult person serving as a parent, or any student, in the exercise of a choice or favor or penalize any person because of a choice made. If the defendant school board employs professional guidance counselors, such persons shall base their guidance and counselling on the individual student's particular personal, academic, and vocational needs. Such guidance and counselling by teachers as well as professional guidance counsellors shall be available to all students without regard to race or color.
 
 
 42
 (p) Protection of Persons Exercising Choice. Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior. The school board shall not publish, allow, or cause to be published, the names or addresses of pupils exercising rights or otherwise affected by this decree. If officials of the school system are not able to provide sufficient protection, they shall seek whatever assistance is necessary from other appropriate officials.
 
 III.
 PROSPECTIVE STUDENTS
 
 43
 Each prospective new student shall be required to exercise a choice of schools before or at the time of enrollment. All such students known to defendants shall be furnished a copy of the prescribed letter to parents, and choice form, by mail or in person, on the date the choice period opens or as soon thereafter as the school system learns that he plans to enroll. Where there is no pre-registration procedure for newly entering students, copies of the choice forms shall be available at the Office of the Superintendent and at each school during the time the school is usually open.
 
 IV.
 TRANSFERS
 
 44
 (a) Transfers for Students. Any student shall have the right at the beginning of a new term, to transfer to any school from which he was excluded or would otherwise be excluded on account of his race or color.
 
 
 45
 (b) Transfers for Special Needs. Any student who requires a course of study not offered at the school to which he has been assigned may be permitted, upon his written application, at the beginning of any school term or semester, to transfer to another school which offers courses for his special needs.
 
 
 46
 (c) Transfers to Special Classes or Schools. If the defendants operate and maintain special classes or schools for physically handicapped, mentally retarded, or gifted children, the defendants may assign children to such schools or classes on a basis related to the function of the special class or school that is other than freedom of choice. In no event shall such assignments be made on the basis of race or color or in a manner which tends to perpetuate a dual school system based on race or color.
 
 V.
 SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS
 
 47
 No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extracurricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to longstanding, non-racially based rules of city, county, or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the defendants shall be conducted without regard to race or color.
 
 VI.
 SCHOOL EQUALIZATION
 
 48
 (a) Inferior Schools. In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools previously maintained for white students. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this paragraph, such school shall be closed as soon as possible, and students enrolled in the school shall be reassigned on the basis of freedom of choice. By October of each year, defendants shall report to the Clerk of the Court pupil-teacher ratios, pupil-classroom ratios, and per-pupil expenditures both as to operating and capital improvement costs, and shall outline the steps to be taken and the time within which they shall accomplish the equalization of such schools.
 
 
 49
 (b) Remedial Programs. The defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education.
 
 VII.
 NEW CONSTRUCTION
 
 50
 The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the vestiges of the dual system.
 
 VIII.
 FACULTY AND STAFF
 
 51
 (a) Faculty Employment. Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Whereever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. Defendants shall take positive and affirmative steps to accomplish the desegregation of their school faculties and to achieve substantial desegregation of faculties in as many of the schools as possible for the 1967-68 school year notwithstanding that teacher contracts for the 1967-68 or 1968-69 school years may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school.
 
 
 52
 (b) Dismissals. Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.
 
 
 53
 (c) Past Assignments. The defendants shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.
 
 IX.
 REPORTS TO THE COURT
 
 54
 (1) Report on Choice Period. The defendants shall serve upon the opposing parties and file with the Clerk of the Court on or before April 15, 1967, and on or before June 15, 1967, and in each subsequent year on or before June 1, a report tabulating by race the number of choice applications and transfer applications received for enrollment in each grade in each school in the system, and the number of choices and transfers granted and the number of denials in each grade of each school. The report shall also state any reasons relied upon in denying choice and shall tabulate, by school and by race of student, the number of choices and transfers denied for each such reason.
 
 
 55
 In addition, the report shall show the percentage of pupils actually transferred or assigned from segregated grades or to schools attended predominantly by pupils of a race other than the race of the applicant, for attendance during the 1966-67 school year, with comparable data for the 1965-66 school year. Such additional information shall be included in the report served upon opposing counsel and filed with the Clerk of the Court.
 
 
 56
 (2) Report After School Opening. The defendants shall, in addition to reports elsewhere described, serve upon opposing counsel and file with the Clerk of the Court within 15 days after the opening of schools for the fall semester of each year, a report setting forth the following information:
 
 
 57
 (i) The name, address, grade, school of choice and school of present attendance of each student who has withdrawn or requested withdrawal of his choice of school or who has transferred after the start of the school year, together with a description of any sction taken by the defendants on his request and the reasons therefor.
 
 
 58
 (ii) The number of faculty vacancies, by school, that have occurred or been filled by the defendants since the order of this Court or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers wrer made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.
 
 
 59
 (iii) The number of students by race, in each grade of each school.
 
 EXPLANATORY LETTER
 
 60
 (School System Name and Office Address)
 
 
 61
 (Date Sent)
 
 Dear Parent:
 
 62
 All grades in our school system will be desegregated next year. Any student who will be entering one of these grades next year may choose to attend any school in our system, regardless of whether that school was formerly all-white or all-Negro. It does not matter which school your child is attending this year. You and your child may select any school you wish.
 
 
 63
 Every student, white and Negro, must make a choice of schools. If a child is entering the ninth or higher grade, or if the child is fifteen years old or older, he may make the choice himself. Otherwise a parent or other adult serving as parent must sign the choice form. A child enrolling in the school system for the first time must make a choice of schools before or at the time of his enrollment.
 
 
 64
 The form on which the choice should be made is attached to this letter. It should be completed and returned by June 1, 1967. You may mail it in the enclosed envelope, or deliver it by messenger or by hand to any school principal or to the Office of the Superintendent at any time between May 1 and June 1. No one may require you to return your choice form before June 1 and no preference is given for returning the choice form early.
 
 
 65
 No principal, teacher or other school official is permitted to influence anyone in making a choice or to require early return of the choice form. No one is permitted to favor or penalize any student or other person because of a choice made. A choice once made cannot be changed except for serious hardship.
 
 
 66
 No child will be denied his choice unless for reasons of overcrowding at the school chosen, in which case children living nearest the school will have preference.
 
 
 67
 Transportation will be provided, if reasonably possible, no matter what school is chosen. (Delete if the school system does not provide transportation.)
 
 
 68
 Your School Board and the school staff will do everything we can to see to it that the rights of all students are protected and that desegregation of our schools is carried out successfully.
 
 
 69
 Sincerely yours, Superintendent.
 
 CHOICE FORM
 
 70
 This form is provided for you to choose a school for your child to attend next year. You have 30 days to make your choice. It does not matter which school your child attended last year, and does not matter whether the school you choose was formerly a white or Negro school. This form must be mailed or brought to the principal of any school in the system or to the office of the Superintendent, (address), by June 1, 1967. A choice is required for each child.
 
 
 71
 (FORM OMITTED)GEWIN, Circuit Judge, with whom GRIFFIN B. BELL, Circuit Judge, concurs (dissenting):
 
 
 72
 The opinion of the majority and the proposed decree are long, complicated, somewhat ambiguous and rather confusing. The per curiam opinion of the majority of the en banc court does not substantially clarify, modify or change anything said in the original opinion filed December 29, 1966. Only minor and inconsequential changes were made in the proposed decree.[1] In my view both the opinion and decree constitute an abrupt and unauthorized departure from the mainstream of judicial thought both of this Circuit and a number of other Circuits. I am unable to agree either with the opinion or the decree, especially those provisions dealing with the following: (1) de facto and de jure segregation; (2) the guidelines; (3) the proposed decree; (4) attendance percentages, proportions, and freedom of choice; and (5) enforced integration.
 
 
 73
 * De Facto and De jure Segregation
 
 
 74
 The thesis of the majority, like Minerva (Athena) of the classic myths,[2] was spawned full-grown and full-armed. It has no substantial legal ancestors.[3] We must wait to see what progeny it will produce.
 
 
 75
 While professing to fashion a remedy under the benevolent canopy of the Federal Constitution, the opinion and the decree are couched in divisive terms and proceed to dichotomize the union of states into two separate and distinct parts. Based on such reasoning the Civil Rights Act of 1964 is stripped of its national character, the national policies therein stated are nullified, and in effect, the remedial purposes of the Act are held to apply to approximately one-third of the states of the union and to a much smaller percentage or proportion of the total population of the country. I am unable to believe that the Congress had any such intent. If it did, a serious constitutional question would be presented as to the validity of the entire Act under our concepts of American constitutional government.
 
 
 76
 The Negro children in Cleveland, Chicago, Los Angeles, Boston, New York, or any other area of the nation which the opinion classifies under de facto segregation, would receive little comfort from the assertion that the racial make-up of their school system does not violate their constitutional rights because they were born into a de facto society, while the exact same racial make-up of the school system in the 17 Southern and border states violates the constitutional rights of their counterparts, or even their blood brothers, because they were born into a de jure society. All children everywhere in the nation are protected by the Constitution, and treatment which violates their constitutional rights in one area of the country, also violates such constitutional rights in another area. The details of the remedy to be applied, however, may vary with local conditions. Basically, all of them must be given the same constitutional protection. Due process and equal protection will not tolerate a lower standard, and surely not a double standard. The problem is a national one.
 
 
 77
 Regardless of our decrees, in spite of our hopes and notwithstanding our disappointments, there is no infallible and certain process of alchemy which will erase decades of history and transmute a distasteful set of circumstances into a utopia of perfection. All who have studied the subject recognize that discriminatory practices did not arise from a single cause. Such practices had their origin and birth in social, economic, educational, legal, geographical and numerous other considerations. These factors tend to be self-perpetuating. We must eradicate them, and I have the faith that they will be eradicated and eliminated by responsible and responsive governmental agencies acting pursuant to the best interests of the community. There is no social antibiotic which will effect a sudden or overnight cure. It is not possible to specifically fix the blame or to attribute the origin of discriminatory practices to isolated causes, and it is surely inappropriate to undertake to fasten guilt upon any segment of the population. In this area of our nation's history eminent historians still disagree as to causes and effects. Some studies have placed emphasis on the slave trader or the importer of slaves, others have blamed the slave holder, while others have tried to trace the guilt back to tribal chieftains in Africa. Perhaps the most common understanding amongst all the historians and students of the problem is the conclusion that causes cannot be isolated and responsibility cannot be limited to a particular group. Whatever the cause or explanation, it is clear that the responsibility rests on many rather than few.
 
 
 78
 At this time, almost 13 years after the decisions in Brown v. Board of Education (1954) 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Brown I) and Brown v. Board of Education (1955) 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (Brown II), there should be no doubt in the minds of anyone that compulsory segregation in the public school systems of this nation must be eliminated. Negro children have a personal, present, and unqualified constitutional right to attend the public schools on a racially non-discriminatory basis.
 
 
 79
 Although espousing the cause of uniformity and asserting there must not be one law for Athens and another for Rome, the opinion does not follow that thesis or principle. One of the chief difficulties which I encounter with the opinion is that it concludes that the Constitution means one thing in 17 states of the nation and something else in the remaining states. This is done by a rather ingenious though illogical distinction between the terms de facto segregation and de jure segregation. While the opinion recognizes the evils common to both types, it relies heavily on background facts to justify the conclusion that the evil will be corrected in one area of the nation and not in the other. In my view the Constitution cannot be bent and twisted in such a manner as to justify or support such an incongruous result. The very subject matter under consideration tends to nullify the assertion that the constitutional prohibition against segregation should be applied in 17 states and not in the rest of the nation.
 
 
 80
 Legislative history clearly supports the idea that no distinction should be made with respect to the various states in dealing with the problem. Senator Pastore was one of the principal spokesmen who handled this legislation. He gave the following explanation:
 
 
 81
 'Frankly I do not see how we could have gone any further, to be fair * * * Section 602 of Title VI, not only requires the agency to promulgate rules and regulations, but all procedure must be in accord with these rules and regulations. They must have broad scope. They must be national. They must apply to all fifty states. We could not draw one rule to apply to the State of Mississippi, another rule to apply to the State of Alabama, and another rule to apply to the State of Rhode Island. There must be only one rule, to apply to every state. Further, the President must approve the rule.' (110 Cong. Rec. 7059, April 7, 1964)
 
 
 82
 'MR. PASTORE * * * We must do what Title VI provides; and we could do it in no milder form than that now provided by Title VI. The Senator from Tennessee says, 'Let us read this title'. I say so, too. When we read these two pages, we understand that the whole philosophy of Title VI is to promote voluntary compliance. It is written right in the law. There shall be the voluntary compliance as the first step, and then the second step they must inaugurate and promulgate, rules that have a ntional effect, not a local effect. They shall apply to Tennessee, to Louisiana, to Rhode Island, in equal fashion.' (110 Cong.Rec. 7066, April 7, 1964)
 
 
 83
 In connection with the distinction which the opinion undertakes to make, it is pertinent to observe the following strong and unequivocal pronouncement in the very beginning of the decision in Brown II:
 
 
 84
 'All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle. There remains for consideration the manner in which relief is to be accorded.' (page 298, 75 S.Ct. page 755)
 
 
 85
 It should be observed that all public school segregation was de jure in the broad sense of that term prior to the first Brown decision, in that segregation was permitted, if not required, by law.
 
 
 86
 It is undoubtedly true that any problem which reaches national proportions is often generated by varying and different customs, mores, laws, habits and manners. Such differences in the causes which contributed to the creation and existence of the problem in the first instance, do not justify the application of a fundamental constitutional principle in one area of the nation and a failure to apply it in another.
 
 
 87
 While all the authorities recognize the existence and operation of different causes in the historical background of racial segregation, there are also marked similarities. This fact is noted in the recently released study by the United States Commission on Civil Rights, RACIAL ISOLATION IN THE SCHOOLS, 1967, Vol. I (pp. 39, 59-79). In discussing the subject the following observation is made early in the report:
 
 
 88
 'Today it (racial isolation or segregation) is attributable to remnants of the dual school system, methods of student assignment, residential segregation, and to those discretionary decisions familiar in the North-- site selection, school construction, transfers, and the determination of where to place students in the event of overcrowding.'
 
 
 89
 In its summary the Commission notes that the causes of racial isolation or school segregation are complex and selfperpetuating. It speaks of the Nation's metropolitan areas and refers to social and economic factors as well as geographical ones. According to the summary, not only do state and local governments share the blame, it is categorically asserted that 'The Federal Government also shares in this responsibility.' Pertinent similarities in the problem, applicable to the entire nation, are forcefully asserted in the final sentence of the Commission's Summary:
 
 
 90
 'In the North, where school segregation was not generally compelled by law, these (discriminatory) policies and practices have helped to increase racial separation. In the South, where until the Brown decision in 1954 school segregation was required by law, similar policies and practices have contributed to its perpetuation.'
 
 
 91
 By a process of syllogistic reasoning based on fatally defective major premises the opinion has distorted the meaning of the term segregation and has segmented its meaning into de facto and de jure segregation. All segregation in the South is classified as de jure[4] while segregation in the North is classified as de facto. Different rules apply to the different types of segregation. The South is heavily condemned. The opinion approaches the problem on a sectional basis and fails to consider the subject except on a sectional or regional basis. There are many references to 'the eleven' Southern states and 'the seven' border states. This area of the nation is variously characterized as 'The eleven states of the Confederacy,' 'the entire region encompassing the southern and border states', 'wearing the badge of slavery', and 'arpartheid'. Finally, the opinion concludes that the two types of segregation are different, have different origins, create different problems and require different corrective action. It is suggested that there is no present remedy for de facto segregation but that the problems and questions arising from de facto segregation may someday be answered by the Supreme Court.[5]
 
 
 92
 This Court, and the district courts within the six states embraced within our jurisdiction like many other federal courts of the nation have given much time and attention to the solution of the problems arising after the Brown decisions. Much has been accomplished, much remains to be done. It is not possible for me to join in the expressions of pessimism contained in the opinion or to approve the insinuations that the courts have failed in the performance of their duty.[6] Even Congress is taken to task for failure to act earlier and for failure to recognize school desegregation 'as the law of the land.'[7] In the Brown cases the Court clearly and wisely recognized the fact that those decisions had changed the law which had been in effect for decades. Due notice was taken of the fact that the new order of the day would 'involve a variety of local problems.' The court recognized 'the complexities arising from the transition to a system of public education freed of racial discrimination.' Moreover, the Court stated, 'Full implementation of these constitutional principles may require solution of varied local school problems.' The courts were instructed to be 'guided by equitable principles,' to give consideration to 'practical flexibility in shaping remedies' and observed that equity courts have a peculiar 'facility for adjusting and reconciling public and private needs.' The Brown decisions emphasized the concept that courts of equity are particularly qualified to shape such remedies as would 'call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles' pronounced in the first Brown decision. Contrary to the tone and expressions of the majority opinion, the Supreme Court early announced the policy of heavy reliance on the district courts and that policy has continued to this date.
 
 II
 Guidelines
 
 93
 With respect to the guidelines, it should be noted that they were not an issue presented to the District Court. The cases here involved had been tried in the respective district courts, appeals taken to this Court and were pending on the docket of this Court before the 1966 Guidelines were promulgated. Guidelines were not made an issue by the pleadings or otherwise in the district courts and no evidence was taken with respect to them. The issue of the guidelines are before this Court because the Court, sua sponte, brought the issue before it.[8] In my view their validity is not an issue to be decided in this Court. See United States v. Petrillo (1947) 332 U.S. 1, 5, 6, 67 S.Ct. 1538, 91 L.Ed. 1877; United States v. International Union (1957) 352 U.S. 567, 590, 77 S.Ct. 529, 1 L.Ed.2d 563; Connor v. New York Times (5 Cir. 1962) 310 F.2d 133, 135; Gibbs v. Blackwell (5 Cir. 1965) 354 F.2d 469, 471.
 
 
 94
 In its first approach to the question the Court indicated that it would not pass upon the constitutionality of the guidelines but would give weight to or rely upon them as a matter of judicial policy. When confronted with the fact that the guidelines were not approved by the President as required by the Civil Rights Act of 1964, the opinion then concluded that they do not constitute or purport to be rules or regulations or orders of general application. It was then stated that since they were not a rule, regulation or order, they constitute 'a statement of policy', and while HEW 'is under no statutory compulsion to issue such statements' it was decided that it is 'of manifest advantage' to the general public to know the basic considerations which the Commissioner uses 'in determining whether a school meets the requirements for eligibility to receive financial assistance.' Immediately the opinion recognizes the inherent unfairness and vices of such pronouncements of administrative policy without an evidentiary hearing. 'The guidelines have the vices of all administrative policies established unilaterally without a hearing.'[9] Finally, the opinion concludes that the guidelines are fully constitutional, recognizing as it is bound to do, that a failure to comply with them cuts the purse strings and closes the treasury to all who fail to comply:
 
 
 95
 'The great bulk of the school districts in this circuit have applied for federal financial assistance and therefore operate under voluntary desegregation plans. Approval of these plans by the Office of Education qualifies the schools for federal aid. In this opinion we have held that the HEW Guidelines now in effect are constitutional and are within the statutory authority created in the Civil Rights Act of 1964. Schools therefore, in compliance with the Guidelines can in general be regarded as discharging constitutional obligations.' (p. 894)
 
 
 96
 Whether viewed from a substantive or procedural point of view, due process and sound judicial administration require, at the very least, an evidentiary hearing on a matter so vital to so many people.[10] Not only are numerous people affected, but the those most affected are the school children of the nation. The most vital segment of our democratic society is our school system. The operation and administration of the public school systems of this nation are essentially a local business. It is unthinkable that matters that so vitally affect this phase of the national welfare should be decided in such summary fashion. In the two most recent pronouncements by the Supreme Court dealing with the problem of segregation as related to faculty and staff, that Court refused to act without an evidentiary hearing. In both decisions the cases were remanded to the district court 'for evidentiary hearings.' Bradley v. School Bd., City of Richmond (1965) 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Rogers v. Paul (1965) 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265. Similarly, in Calhoun v. Latimer (1964) 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288, the Court had for consideration a desegregation plan of the Atlanta Board of Education. During the argument before the Supreme Court counsel for the Board of Education informed the Court that subsequent to the decision of the lower court, the Board had adopted additional provisions authorizing 'free transfers with certain limitations in the city high schools'. The petitioners contended that the changes did not meet constitutional standards and asserted that with respect to elementary students the changed plan would not achieve desegregation until sometime in the 1970's. The Supreme Court did not 'grasp the nettle' but vacated the order of the lower court and remanded the case to 'be appraised by the District Court in a proper evidentiary hearing.'
 
 III
 Decree
 
 97
 I now come to a consideration of the decree ordered to be entered and its relation to the opinion. It is impossible to consider the decree and the opinion separately; they are inextricably interwoven. Neither takes into account 'multifarious local difficulties', and therefore, any particular or peculiar local problems are submerged and sacrificed to the apparent determination, evident on the face of both the opinion and the decree, to achieve percentage enrollments which will reflect the kind of racial balance the opinion seeks to achieve.
 
 
 98
 The opinion asserts that uniformity must be achieved forthwith in everyone of the six states embraced within the Fifth Circuit. No consideration is given to any distinction in any of the numerous school systems involved. Urban schools, rural ones, small schools, large ones, areas where racial imbalance is large or small, the relative number of Negro and white children in any particular area, or any of the other myriad problems which are known to every school administrator, are taken into account. All things must yield to speed, uniformity, percentages and proportional representation. There are no limitations and there are no excuses. This philosophy does not comport with the philosophy which has guided and been inherent in the segregation problem since Brown II. As the Court there stated:
 
 
 99
 'Because these cases arose under different local conditions and their disposition will involve a variety of local problems, we required further argument on the question of relief.' (349 U.S. p. 298, 75 S.Ct. p. 755)
 
 
 100
 See also Davis v. Bd. of School Comm'rs of Mobile Co., Ala., 322 F.2d 356 (5 Cir. 1963) wherein this Court made a distinction in the rural and urban schools of Mobile County, Alabama. We held:
 
 
 101
 'The District Court may modify this order to defer desegregation of rural schools in Mobile County until September 1964, should the District Court after further hearing conclude that special planning of administrative problems for rural schools in the county make it impracticable for such schools to start desegregation in September 1963.'
 
 
 102
 The effectiveness of the district courts has been seriously impaired, in a real sense, contrary to the teachings of all the decisions of the Supreme Court since Brown II. Under the opinion and decree a United States District Judge serves essentially as a referee master, or hearing examiner. Now his only functions are to order the enforcement of the detailed, uniform, stereotyped formal decree, to supervise compliance with its detailed provisions as therein ordered and directed, and to receive periodic reports much in the same fashion as reports are received by an ordinary clerk in a large business establishment.
 
 
 103
 Such a detailed decree on the appellate level not only violates sound concepts of judicial administration, but it violates a longstanding philosophy of the federal judicial system, and indeed all judicial systems common to this country, which vest wide discretion and authority in trial courts because of their closeness to and familiarity with local problems. See the opinions in Brown II, Bradley, Rogers, and Calhoun. For example, in Brown II the Court stated:
 
 
 104
 'Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of the school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts. 'In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision.'
 
 
 105
 The opinion asserts that 'most judges' do not possess the necessary competence to deal with the questions presented, and do not 'know the right questions, much less the right answers.' Notwithstanding the foregoing assertion, the judges of the majority, acting on the appellate level, proceed to fashion a decree of such minute detail and specificity as to remove all discretion and authority from the district judges on whom the Supreme Court has relied so heavily. In my view the district judges are in much better position to know the questions and the answers than appellate judges who necessarily function some distance away from an evidentiary hearing and are removed from the 'multifarious local problems' and 'the variety of obstacles' inherent in the solution of the issues presented.
 
 IV
 
 106
 Percentages, Proportions and Freedom of Choice
 
 
 107
 Freedom of choice means the unrestricted, stricted, uninhibited, unrestrained, unhurried, and unharried right to choose where a student will attend public school subject only to administrative considerations which do not take into account or are not related to considerations of race. If there is a free choice, free in every sense of the word, exercised by students or by their parents, or by both, depending on the circumstances, in accordance with a plan fairly and justly administered for the purpose of eliminating segregation, the dual school system as such will ultimately disappear. Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Bradley v. School Board, 345 F.2d 310, 318 (4 Cir. 1965), vacated and remanded on other grounds, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965 per curiam). See also Clark v. Board of Educ. of Little Rock, 369 F.2d 661 (8 Cir. 1966); Deal v. Cincinnati Bd. of Educ., 369 F.2d 55, 59 (6 Cir. 1966); Lee et al. v. Nacon County Board of Education et al. (D.C.M.D.Ala.1967) 267 F.Supp. 458. If the completely free choice is afforded and neither the students nor their parents desire to change the schools the students have heretofore attended, this Court is without authority under the Constitution or any enactment of Congress to compel them to make a change. Implicit in freedom of choice is the right to choose to remain in a particular school, perhaps the school heretofore attended. That in itself is the exercise of a free choice. The fact that Negro children may not choose to leave their associates, friends, or members of their families to attend a school where those associates are eliminated does not mean that freedom of choice does not work or is not effectively afforded. The assertion by the majority that 'the only school desegregation plan that meets Constitutional standards is one that works' as interpreted by that opinion, simply means that students and parents will not be given a free choice if the results envisioned by the majority are not actually achieved. There must be a mixing of the races according to majority philosophy even if such mixing can only be achieved under the lash of compulsion. If the percentage of Negro and white children attending a particular school does not conform to the percentage of Negro and white school population prevalent in the community, the majority concludes that the plan of desegregation does not work. Accordingly, while professing to vouchsafe freedom and liberty to Negro children, they have destroyed the freedom and liberty of all students, Negro and white alike. There must be a mixing of the races, or integration at all costs, or the plan does not work according to the opinion. Such has not been and is not now the spirit or the letter of the law.
 
 
 108
 The aim and attitude of the majority is reflected by the following statement:
 
 
 109
 'In reviewing the effectiveness of an approved plan it seems reasonable to use some sort of yardstick or objective percentage guide. The percentage requirements in the Guidelines are modest, suggesting only that systems using free choice plans for at least two years should expect 15 to 18 per cent of the pupil population to have selected desegregated schools.'
 
 
 110
 Further the Court equates the percentage attendance test with percentages in jury exclusion[11] cases and voter registration cases. It should be pointed out that such cases had no element of free choice in them, and therefore, the comparison is inapposite. In the instant cases the majority condemns a free choice plan unless it achieves the percentage result which suits the majority. Accordingly, the opinion concludes:
 
 
 111
 'Percentages have been used in other civil rights cases. A similar inference may be drawn in school desegregation cases, when the number of Negroes attending school with white children is manifestly out of line with the ratio of Negro dchool children to white school children in public schools. Common sense suggests that a gross discrepancy between the ratio of Negroes to white children in a school and the HEW percentage guides raises an inference that the school plan is not working as it should in providing a unitary, integrated system.'
 
 
 112
 There is no constitutional requirement of proportional representation in the schools according to race. Furthermore, since there can be no exclusion based on race, proportional limitation is likewise impermissible under the Constitution.
 
 
 113
 We should be concerned with the elimination of discrimination on account of race, and freedom of choice is one means of accomplishing that goal. It is not our function to condemn the children or the school authorities because the free choices actually made do not comport with our own notions of what the choices should have been. When our concepts as to proportions and percentages are imposed on school systems, notwithstanding free choices actually made, we have destroyed freedom and liberty by judicial fiat; and even worse, we have done so in the very name of that liberty and freedom we so avidly claim to espouse and embrace. Our duty in seeking to eliminate racial discrimination is to vouchsafe to all children, regardless of race, a full, complete and timely free choice of schools in appropriate cases in keeping with sound administrative practices which take into consideration proper criteria. Both proportional representation and proportional limitation are equally unconstitutional.
 
 V
 Enforced Integration
 
 114
 The opinion seeks to find a Congressional mandate requiring compulsory or enforced integration in the public schools as distinguished from the elimination of segregation. Throughout the opinion there appear a tangled conglomeration of words and phrases of various shades of meaning, all of which are equated with each other to reach the conclusion desired by the majority that school boards in this Circuit must adopt and implement a plan of forced integration.
 
 
 115
 It seems appropriate to return to the Civil Rights Act of 1964 and the legislative history which spawned its enactment in order to ascertain the true Congressional intent. Section 401(b), 42 U.S.C.A. 2000c(b) defines desegregation in unequivocal terms:
 
 
 116
 "Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance.'
 
 
 117
 Section 407(a)(2) of Title IV, Title 42 2000c-6(a)(2) provides as follows:
 
 
 118
 '* * * provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards.'
 
 
 119
 It should be noted that the portion of the language of the proviso which is underscored is omitted in the court's opinion. As to enforced integration the following statement by Senator Humphrey is exactly in point:
 
 
 120
 'Mr. Humphrey * * * I should like to make one further reference to the Gary case. This case makes it quite clear that while the Constitution prohibits segregation, it does not require integration * * *. The bill does not attempt to integrate the schools but it does attempt to eliminate segregation in the schools * * *. The fact that there is a racial imbalance per se is not something which is unconstitutional. That is why we have attempted to clarify it with the language of Section 4.' (110 Congressional Record 12717)
 
 
 121
 Likewise with respect to Section 407(a)(2) Senator Humphrey's statement clarifies and makes plain the Congressional intent by referring to the Gary case.[12]
 
 
 122
 The following additional excerpts from the legislative history serve to clarify the intent of Congress. Congressman Celler, Chairman of the Judiciary Committee of the House and Floor Manager of the bill:
 
 
 123
 'There is no authorization for either the Attorney General or the Commissioner of Education to work toward achieving racial balance in given schools.' (110 Congressional Record 1519, January 31, 1964)
 
 Senators Byrd and Humphrey:
 
 124
 'MR. BYRD of West Virginia. But would the Senator from Minnesota also indicate whether the words 'provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance' would preclude the Office of Education, under section 602 or Title VI, from establishing a requirement that school boards and school districts shall take action to relieve racial imbalance wherever it may be deemed to exist?
 
 
 125
 'MR. HUMPHREY. Yes, I do not believe in duplicity. I believe that if we include the language in Title IV, it must apply throughout the Act.' (110 Congressional Record, Page 12715, June 4, 1964).
 
 Senator Javits:
 
 126
 'MR. JAVITS * * * Taking the case of the schools to which the Senator is referring, and the danger of envisaging the rule or regulation relating to racial imbalance, it is negated expressly in the bill, which would compel racial balance. Therefore there is no case in which the thrust of the statute under which the money would be given would be directed toward restoring or bringing about a racial balance in the schools. If such a rule were adopted or promulgated by a bureaucrat, and approved by the President, the Senator's State would have an open and shut case under Section 603. That is why we have provided for judicial review. The Senator knows as a lawyer that we never can stop anyone from suing, nor stop any Government official from making a fool of himself, or from trying to do something that he has no right to do, except by remedies provided by law. So I believe it is that set of words which is operative.' (110 Congressional Record, Page 12717, June 4, 1964).
 
 Senators Byrd and Humphrey:
 
 127
 'MR. BYRD of West Virginia * * *. Cannot the Office of Education, pursuant to carrying out this regulation, deny assistance to school districts wherein racial imbalance exists?
 
 
 128
 MR. HUMPHREY. Let me read from the substitute: Provided, that nothing herein shall empower any official or court of the United States to issue any order.
 
 
 129
 MR. BYRD of West Virginia. 'To isuse any order', but does it provide that the Office of Education shall not cut off Federal assistance?
 
 
 130
 MR. HUMPHREY. But in order to cut off Federal assistance, the President would have to issue the order, if the Senator will read Section 602.
 
 
 131
 MR. BYRD of West Virginia. The words are: No such rule, regulation, or order shall become effective unless and until approved by the president.
 
 
 132
 MR. HUMPHREY. That is correct.
 
 
 133
 MR. BYRD of West Virginia. What assurance does the Senator give me that the President will not approve such a requirement?
 
 
 134
 MR. HUMPHREY. Because I do not believe the President will violate the law.' (110 Congressional Record, Page 12715, June 4, 1964).
 
 
 135
 In order to escape the clear meaning of the quoted statutes and the unquestioned intent of Congress as illustrated by the legislative history, the opinion summarily obliterates any distinction between desegregation and integration. Within the context of the opinion integration means forced or enforced integration. Again the term integration is applied only to de jure segregated schools. An analysis of the opinion demonstrates that the process of reasoning used amounts to an unauthorized insertion of the word 'de jure' to achieve and maintain the de facto and de jure distinction with which I dealt earlier. By means of this device the opinion converts the Civil Rights Act of 1964 into a new and different concept entirely foreign to its true meaning. I quote several typical excerpts from the opinion:
 
 
 136
 'We use the terms 'integration' and 'desegregation' of formerly segregated public schools to mean the conversion of a de jure segregated dual system to a unitary, nonracial (nondiscriminatory) system-- lock, stock, and barrel: students, faculty, staff, facilities, programs, and activities.' (footnote 5, page 846 of 372 F.2d). 'The national policy is plain: formerly de jure segregated public school systems based on dual attendance zones must shift to unitary nonracial system-- with or without federal funds.' (page 850). 'Although the legislative history of the statute shows that the floor managers for the Act and other members of the Senate and House cited and quoted these two opinions they did so within the context of the problem of de facto segregation.' (page 862). (The two cases mentioned are Briggs and Bell.) 'As used in the Act, therefore, 'desegregation' refers only to the disestablishment of segregation in de jure segregated schools.' (page 878). 'Senator Humphrey spoke several tmes in the language of Briggs but his references to Bell indicate that the restrictions in the Act were pointed at the Gary, Indiana de facto type of segregation.' (page 881).
 
 
 137
 Again it should be said that it is not easy to understand the reasoning by which the majority concludes that the Federal Constitution requires integration of formerly de jure school systems but does not require the integration of de facto systems. Apparently faced with this dilemma the majority realized that it must challenge the jurisprudence established by Briggs v. Elliott (E.D.S.C. 1955) 132 F.Supp. 776, and Bell v. School City of Gary (N.D.Ind.1963) 213 F.Supp. 819, affirmed 324 F.2d 209 (7 Cir. 1963). The opinion refers to these cases as 'two glosses on Brown'. The repeated assertions of Senators showing their reliance upon the two decisions in question give emphasis to the meaning of the teaching of those two cases. Senator Humphrey actually stated that the thrust of Judge Beamer's opinion in the Gary case was incorporated into the Civil Rights Act of 1964.[13] The majority disposes of Senator Humphrey's comment and the Gary case by asserting that the school districts were drawn without regard to race. The following is from the opinion:
 
 
 138
 'Senator Humphrey spoke several times in the language of Briggs but his references to Bell indicate that the restrictions in the Act were pointed at the Gary, Indiana de facto type of segregation.' (opinion page 80).
 
 
 139
 While it may be true that the facts in Gary showed good faith on the part of the school board, it is likewise true that the Gary school system involved de jure segregation within the meaning of the majority opinion. We quote from Judge Beamer's opinion, 213 F.Supp. at 822:
 
 
 140
 'Prior to 1949, Gary had segregated schools in what is commonly known as the Pulaski Complex. Two schools were built on the same campus, one was called Pulaski-East and the other Pulaski-west. One was occupied by Negro students and the other by white students. This was in accordance with the separate but equal policy, then permitted by Indiana law, (Burns Indiana Statutes Annotated, 1948 Replacement, Section 28-5104)'.
 
 
 141
 The difficulty of the majority is further increased by virtue of the fact that Judge Beamer cited cases which uphold the Briggs doctrine. More important, when the case was affirmed by the Court of Appeals of the Seventh Circuit, the so-called Briggs dictum was cited as authority for the court's holding, 324 F.2d at 213.
 
 
 142
 If the alleged Briggs dictum is so clearly erroneous and constitutionally unsound, it is difficult to believe that it would have been accepted for a period of almost twelve years and quoted so many times. Even the majority concedes that the court in Briggs was composed of distinguished jurists, Judges Parker, Dobie and Timmerman. If the majority is correct, it is entirely likely that never before have so many judges been misled, including judges of this Court,[14] for so long by such a clear, understandable direct, and concise holding as the language in Briggs which the opinion now condemns. The language is straightforward and simple: 'The Constitution, in other words, does not require integration. It merely forbids discrimination.'
 
 
 143
 It is interesting also to observe that the Supreme Court has never disturbed the Briggs language, although it has had numberous opportunities to do so. As a matter of fact, it has come very close to approving it; if it has not actually done so. In the case of Shuttlesworth v. Birmingham Board of Ed. (N.D.Ala.1958) 162 F.Supp. 372, 378, the district court speaking through Judge Rives quoted the Briggs opinion. The Supreme Court affirmed the judgment. Shuttlesworth v. Birmingham Board of Ed., 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145.
 
 
 144
 The majority rule requiring compulsory integration is new and novel, and it has not been accepted by the Supreme Court or by the other Circuits. The rationale of Briggs has been approved. Brown decisions, supra; Goss v. Bd. of Educ. of City of Knoxville, supra; Bolling v. Sharpe, 347 U.S. 497, 498, 74 S.Ct. 693, 98 L.Ed. 884; Com. of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792; Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (passim); Scull v. Com. of Virginia, 359 U.S. 344, 346, 79 S.Ct. 838, 3 L.Ed.2d 865; Wolfe v. State of North Carolina, 364 U.S. 177, 182, 80 S.Ct. 1482, 4 L.Ed.2d 1650; Gomillion v. Lightfoot, 364 U.S. 339, 349, 81 S.Ct. 125, 5 L.Ed.2d 110; Garner v. State of Louisiana, 368 U.S. 157, 178, 82 S.Ct. 248, 7 L.Ed.2d 207; Turner v. City of Memphis, 369 U.S. 350, 353, 82 S.Ct. 805, 7 L.Ed.2d 762; Johnson v. State of Virginia, 373 U.S. 61, 62, 83 S.Ct. 1053, 10 L.Ed.2d 195; Wright v. Rockefeller, 376 U.S. 52, 57-58, 84 S.Ct. 603, 11 L.Ed.2d 512; Springfield School Committee v. Barksdale (1 Cir. 1965) 348 F.2d 261; Bradley v. School Board of City of Richmond, Va. (4 Cir. 1965) 345 F.2d 310; Swann v. Charlotte-Mecklenburg Board of Educ. (4 Cir. 1966) 369 F.2d 29; Deal v. Cincinnati Board of Educ. (6 Cir. 1966) 369 F.2d 55; Bell v. School City of Gary, Indiana (7 Cir. 1963) 324 F.2d 209; Clark v. Board of Educ. of Little Rock (8 Cir. 1966) 369 F.2d 661; Downs v. Board of Educ. of Kansas City (10 Cir. 1964) 336 F.2d 988, cert. den., 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800.
 
 Conclusion
 
 145
 It is my judgment that the de facto-dejure distinction created in the opinion can not be supported as a matter of law. Percentage or proportional enrollment requirements based on race, and enforced integration are in violation of well established constitutional concepts in my opinion.
 
 
 146
 While it cannot be denied there has been recalcitrance and resistance to desegregation as required by the Brown decisions in numerous areas, I cannot share in the pessimism expressed in the opinion. Throughout the country a substantial effort has been made to eliminate segregation and substantial progress has been made. The Brown decisions contemplated soem difficulties and complexities. A review of the history of the difficulties involved strongly indicate that the greatest problems arise when a start or 'break through' is initiated. Recalcitrance and resistance which appeared initially in many areas have now subsided or disappeared. It is also true that the emphasis has shifted properly from 'deliberate' to 'speed' I continue to have confidence in the local school boards of the nation. While some of them have performed slowly and a few have not performed at all, the vast majority of school boards are composed of conscientious, civic minded, sincere people who are undertaking to do what is best for the school children of the nation. We should not interfere with them unduly.
 
 
 147
 Furthermore, I continue to have confidence in the judicial system of the country and hold the firm belief that the record of the courts in achieving compliance with the Brown decisions demonstrates that the courts have given their prompt, careful and diligent attention to the problems as they have arisen. In my view the heaviest burden has been on the district courts, and inevitably the best solutions will come at the district court level where the judges are in close contact with local complexities, obstacles and problems. The primary responsibility should be left where the Brown decisions placed it, with the boards of education under the supervision and guidance of the district courts. This is not to say that the courts should not accord full consideration to the expertise of the Department of Health, Education and Welfare; and we should give due consideration to HEW Guidelines when it is appropriate to do so. However, the provisions of the Civil Rights Act of 1964 should not by by-passed. Rules, regulations and orders of general application should be enacted in accordance with the requirements of due process and school ststems should not be penalized by such rules, regulations or orders which are not approved by the President as provided by the Act. It is no answer to say that the guidelines are interpretive regulations or 'housekeeping' rules. They are being used and applied as general rules, regulations or orders.
 
 
 148
 Due to developments in the jurisprudence, particularly with respect to desegregation of faculty and staff, the orders of the district courts should be vacated and the causes remanded for further consideration and for evidentiary hearings in the district courts. In effect the appellees recognize the fact that this must be done. We should not reverse the district courts on questions which were not issues before them and fashion our own decree with respect to such issues without any evidentiary basis or without affording an opportunity for the presentation of evidence relating to such issues in the district courts.
 
 
 149
 GRIFFIN B. BELL, Circuit Judge, with whom GEWIN, Circuit Judge joins (dissenting).
 
 
 150
 I respectfully dissent. The two-judge or original opinion of December 20, 1966 is what the majority has adopted. That opinion seriously erodes that doctrine of separation of powers as between the Executive and the Judiciary. Moreover, much of its language is in the nature of overreach and, as such, adds confusion and unrest to the already troubled area of school desegregation. The overtones of compulsory integration and school racial balances in the original opinion can only chill the efforts of school administrators to complete the task of eliminating dual school systems in the South. In addition, the other side of some of the more important holdings of the majority opinion should be considered and those propositions stated which militate against their validity.
 
 
 151
 The plain intent of the two opinions is to establish a uniform law for the school systems of this circuit. Thus, the opinions must be tested as laws. Their validity and efficacy as laws should be considered in the frame of reference of need, fairness, clarity and what is constitutionally permissible.
 
 
 152
 It is fundamental in law making that laws should be fair as between peopel and sections. The requirement that laws be clear in meaning is also a fundamental. We cannot be expected to obey the law if we cannot understand it. Caligula kept the meaning of the laws from the Romans by posting them in narrow places and in small print[1] -- it is no different today when the law is couched in vagueness.
 
 
 153
 Then there is the matter of personal liberty. Under our system of government, it is not to be restricted except where necessary, in balance, to give others their liberty, and to attain order so that all may enjoy liberty. History records that sumptuary laws have been largely unobserved because they failed to recognize or were needlessly restrictive of personal liberty. Our experiments with sumptuary-like laws are exemplified by the Dred Scott decision, Scott v. Sandford, 19 How. 393, 15 L.Ed. 691, Reconstruction, and the prohibition laws. All failed.
 
 
 154
 The majority opinions, considered to gether, fail to meet the tests of fairness and clarity. The advance approval given to a requirement of compelled integration exceeds what is constitutionally permissible under the Fourteenth Amendment. They cast a long shadow over personal liberty as it embraces freedom of association and a free society. They do little for the cause of education.
 
 
 155
 It is important, however, that this dissenting opinion not mislead any person having responsibility in the area of school desegregation. The dual system of education must be eliminated. This was ordered in 1955. Brown v. Board of Education of Topeka, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. School boards were told to convert the dual segregated school ststems into racially nondiscriminatory school systems. The court pointed to problems that might arise in the transition with respect to the physical condition of school plants, transportation, personnel, and in the revision of school districts and attendance areas into compact areas. This order followed reargument of the question of remedy after the 1954 decision holding segregated education under the separate but equal doctrine unlawful. Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. After full argument, the transition was ordered. The separate but equal doctrine was already lost and the time for remedy was at hand. Transition was the remedy provided.
 
 
 156
 Transition to date has in the main consisted of following a freedom of choice plan for pupil assignment. But freedom of choice without faculty desegregation and the elimination of discrimination in buildings, eqyipment, services and curriculum buildings, equipment, services and curriculum system into a unitary nondiscriminatory system. The slow progress to date toward eliminating dual systems is what has brought about the majority opinions, and is also at the root of the disturbance between the Health, Education, and Welfare Department and many school boards. The objective must be, as the Department of Justice contends, that there be no white schools-- no Negro schools-- just schools. But this is all that is required and it can be accomplished without the open-end compulsory integration language of the majority opinions, or the geometric progression guidelines[2] of HEW which the majority opinion approves.
 
 
 157
 The mandate of the Supreme Court in Brown II can be carried out by the assignment of faculty and students without regard to race, and by affording equality in educational opportunity from the standpoint of buildings, equipment, and curriculum. Where freedom of choice in student assignment is ineffective to the extent that a dual system continues, it can be implemented by a neighborhood assignment plan. Assignments should then be made by the school board to the school nearest the home of the student, whether formerly white or Negro. Then the child would be given the option under a freedom of choice plan of attending another school with priority to attend being based on proximity of residence to school. This method of student assignment is comparable to what is being used in Charlotte. Cf. Swann v. Charlotte-Mecklenburg Board of Education, 4 Cir., 1966, 369 F.2d 29 (En banc).
 
 
 158
 We should order the school boards in these cases, which they and the entire court agree must be reversed, to forthwith complete the conversion from dual to unitary systems by the use of these minimum but mandatory directions. School boards and the public would understand the objective-- to convert dual school systems into unitary nondiscriminatory systems just as the Supreme Court directed twelve years ago. School boards and the public would also understand the method to be followed in the conversion. But this approach is too simple for the majority. Their view is that something more is required-- a result which brings about substantial integration of students. The mandatory assignment of students based on race is the method selected to achieve this result. This is a new and drastic doctrine. It is a new dimension in constitutional law and in race relations. It is new fuel in a field where the old fire has not been brought under control.
 
 
 159
 PROCEDURAL DUE PROCESS AND THE APPROVAL OF THE GUIDELINES
 
 
 160
 The scope of the majority holding as to the binding force on the federal courts of the HEW guidelines in the area of school desegregation posed a serious separation of powers question. That fact alone should have indicated that the validity of the HEW guidelines was of primary concern. One of the major premises of the original or panel opinion is that HEW excuses those school systems which are under court order from compliance with its guidelines; hence, the necessity of the court setting the guidelines as minimum standards to prevent the courts from being used as an escape route. The original HEW Regulation promulgated in 1964 makes this possible. Title 45A, CFR, 80.4(c). The HEW statement of policy of 1965, Title 45, CFR, 181.4, receded from this position but the latest HEW policy supersedes the 1965 statement which includes 181.4, supra. See HEW March and December 1966 Statements-- not reported in CFR.
 
 
 161
 The HEW Statements of Policies for School Desegregation are referred to generally in the school desegregation world as guidelines. At least three such statements have been issued; one in 1965, one in March 1966, and another in December 1966. There apparently have been amendments. Footnote 2, supra. No guidelines whatever were in issue in the lower courts.[3] The guidelines of March 1966 had not been promulgated when the cases were there. Indeed the guidelines of December 1966 had not been promulagated when the cases were submitted after argument to the original panel of this court. The fact that they had not been in issue did not deter the court in the original opinion. There it was held that the '* * * HEW guidelines now in effect are constitutional and are within the statutory authority created in the Civil Rights Act of 1964'. This perhaps meant all guidelines promulgated up to the date of the opinion, december 29, 1966. Any doubt as to the inclusion of the December 1966 guidelines was resolved when the majority in the en banc per curiam opinion stated that the 1965 and 1966 HEW guidelines are within the decisions of this court and comply with the letter and spirit of the Civil Rights Act of 1964 and meet the requirements of the United States Constitution. This is adjudication without any semblance of due process of law. It is an unprecedented procedure and a shocking departure from even rudimentary due process.[4] Approval of future guidelines is limited by the majority to those '* * * within lawful limits.'
 
 
 162
 The theory of the court escape route and the necessity to hold all guidelines valid is apparently developed in the interest of supporting the national policy, as expressed in the Civil Rights Act of 1964, of eliminating discrimination in public education. The general theme of the majority is the HEW has the carrot in the form of federal funds but no stick. A stick is needed in those situations where a school board may not take federal funds. The aim is to make a stick out of the federal courts. The courts should cooperate with HEW but they cannot be made to play the part of any stick that HEW may formulate and this is the tenor of the original opinion. Courts are restricted to acting within the limits of the Fourteenth Amendment in the school desegregation area. It may or may not be proper for a court to act within the limits of what the HEW policy may be in allocating federal school funds. Sometimes there may be a difference. A decent respect for the judiciary dictates that we make this plain.
 
 
 163
 THE STANDARD REQUIRED BY THE MAJORITY IS UNCONSTITUTIONALLY VAGUE
 
 
 164
 The original opinion states in two places that the only satisfactory plan for desegregating a school system is one that works. One looks in vain for a definition of 'one that works'. This is manifestly a vague standard. It cannot be followed. Moreover, it is subject to selective enforcement and a statute couched in such language would be patently unconstitutional.
 
 
 165
 In another place in the original opinion the statement is made that substantial integration must be achieved in disestablishing dual school systems. This is not clear. What is substantial? Is the reference simply to a system, or to each school, or to each class room?
 
 
 166
 The en banc per curiam opinion may have attempted to improve the standard by saying that the criterion for determining the validity of a provision in a school desegregation plan is whether the provision is reasonably related to accomplishing the objective of educational opportunities on equal terms to all. Who knows the meaning of this? There is no mention of result.
 
 
 167
 These vague standards are perhaps the most mischievous parts of the majority opinions. They place unfettered discretion in HEW in the area of school desegregation. No school board will ever know when it has performed its duty to eliminate the dual school system. No school board will ever know whether federal funds will be made available. This type of standard places school systems under men and not laws. School boards and school patrons are entitled to a clear and definite standard. The problem of desegregation will not be solved absent a clear standard.
 
 THE DE JURE-DE FACTO DOC TRINE IS UNFAIR
 
 168
 The unfairness which inheres in the majority opinion stems from the new doctrine which the original panel fashioned under the concept of classifying segregation into two types: de jure segregation, called apartheid, for the seventeen southern and border states formerly having legal segregation; and de facto segregation for the other states of the nation. This distinction, which must be without a difference and somewhat hollow to a deprived child wherever located, is used as a beginning. The original opinion then goes on to require affirmative action on the part of the school authorities in the de jure systems to integrate the schools. The neighborhood school systems of the nation with their de facto segregation are excused. The Constitution does not reach them.[5]
 
 
 169
 This reasoning is necessary to reach the end of compulsory integration in the so-called de jure states. It is the counterpart to overruling the settled construction of the Fourteenth Amendment, to be next discussed, that integration is not commanded. The restrictions in the Civil Rights Act of 1964 against requiring school racial balances by assignment and transportation are written out of the law with respect to the de jure states by using the de jure-de facto theory. Title IV, 401(b), 407(a), 42 U.S.C.A. 2000c(b), 2000c-6. The overruling of the constitutional limitation removes the other impediment to compulsory integration. The way is thus cleared for the new dimension. The only question left is when, and to what extent. The authority to HEW is carte blanche. We should disavow the de jurede facto doctrine as being itself violative of the equal protection clause. It treats school systems differently. It treats children differently. It is reverse apartheid. It poses the question whether legally compelled integration is to be substituted for legally compelled segregation. It is unthinkable that our Constitution does not contemplate a middle ground-- no compulsion one way or the other.
 
 
 170
 The de jure-de facto doctrine simply is without basis. Segregation by law was legal until the Brown decision in 1954. Such segregation should hardly give rise to punitive treatment of those states employing what was then a legal system. The Supreme Court has never so indicated. Moreover, the Supreme Court holding in Brown was based on the finding that segregated education was unequal. How can it be unequal in one section of the country and not another? Does Brown interdict only segregation imposed affirmatively by law, or does its rationale also include the state action of holding to neighborhood assignments thereby perpetuating de facto segregation? The majority decision limits the rationale to the southern and border states type of segregation formerly imposed affirmatively by law. In such event compelled integration may be required in the de jure states but the logic of reaching this point, because of the restrictions in the 1964 Act to the contrary, excuses the de facto states from the Act and the Constitution.
 
 
 171
 The real answer is that no such new doctrine or theory is necessary. The schools of the South and border states must do what the Supreme Court has ordered-- convert dual school systems into unitary nondiscriminatory school systems. The constitutional power already exists in the courts to see that this is done. This newly discovered source of power tends only to disturb settled doctrine. Its purpose can only be to require racial balances in the de jure states.
 
 THE BRIGGS DICTUM
 
 172
 It is a settled constitutional principle that the Fourteenth Amendment does not require compulsory integration but only proscribes segregation. It is the state action segregation which violates the equal protection clause. We have so stated in the following cases: Avery v. Wichita Falls Independent School District, 1956, 241 F.2d 230; Borders v. Rippy, 1957, 247 F.2d 268; Rippy v. Borders, 1957, 250 F.2d 690; Cohen v. Public Housing Administration, 1958, 257 F.2d 73; City of Montgomery v. Gilmore, 1960, 277 F.2d 364; Boson v. Rippy, 1960, 285 F.2d 43; Stell v. Savannah-Chatham County Board of Education, 1964, 333 F.2d 55; Evers v. Jackson Municipal Separate School District, 1964, 328 F.2d 408; Lockett v. Board of Education of Muscogee County, 1965, 342 F.2d 225.
 
 
 173
 This principle is euphoneously referred to in the original two-judge opinion as the Briggs dictum. It was stated in Briggs v. Elliott, E.D.S.C., 1955, 132 F.Supp. 776, but no court, until now, has ever held the Fourteenth Amendment to mean otherwise. The Amendment is entirely negative in character. The original panel, as a part of its two-pronged approach to compulsory integration, overruled this principle sub silentio.
 
 
 174
 The court, sitting en banc, could overrule this settled principle and the majority has now done so to an unknown extent in paragraph 3 of the per curiam opinion. We will not know the extent until the question of racial percentages is squarely presented. Here, as I understand the per curiam opinion, the question is tangential except as it relates to converting to a unitary school system. In the first sentence of paragraph 3 the majority holds that school boards have the affirmative duty under the Fourteenth Amendment to bring about a unitary school system in which there are no Negro or white schools-- just schools. We can all agree on this statement. The opinion does away with any distinction between the terms 'integration' and 'segregation' in the field of school desegregation law insofar as the distinction interferes with the affirmative duty to bring about unitary school systems. We can all agree on this. It is then said that in fulfilling this duty it is not enough for school authorities to offer Negro children the opportunity to attend formerly all white schools but that such opportunity must be coupled with the integration of faculty, facilities, and activities. Then, without more, the decisions of this court setting out this principle are overruled to the extent that they conflict with the view of the majority. I am left in doubt as to whether this is a retrenchment from the panel decision. Time will tell.
 
 
 175
 It may be added that if the court is overruling this settled constitutional principle, it brings this circuit into conflict with the First, Fourth, Sixth, Seventh, Eighth, and Tenth Circuits. Springfield School Committee v. Barksdale, 1 Cir., 1965, 348 F.2d 261; Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 1965, 345 F.2d 310; Swann v. Charlotte-Mecklenburg Board of Education, 4 Cir., 1966, 369 F.2d 29; Deal v. Cincinnati Board of Education, 6 Cir., 1966, 369 F.2d 55; Bell v. School City of Gary, Indiana, 7 Cir., 1963, 324 F.2d 209, cert. den., 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216; Clark v. Board of Education of Little Rock, 8 Cir., 1966, 369 F.2d 661; and Downs v. Board of Education of Kansas City, 10 Cir., 1964, 336 F.2d 988, cert. den., 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800. The case of Taylor v. Board of Education of City School Dist. of City of New Rochelle, 2 Cir., 1961, 294 F.2d 36 is not to the contrary. There the remedy fashioned was freedom of choice imposed on neighborhood assignments. The case of Board of Education of Oklahoma City, etc. v. Dowell, 10 Cir., 1967, 375 F.2d 158, (dated January 23, 1967), does not appear to be to the contrary. The court distinguished Downs by pointing out that Dowell involved a finding of bad faith on the part of the school board in carrying out the original order of the District Court to disestablish the dual school system.
 
 
 176
 It is hard to know just what the court has held as between the panel decision and the en banc per curiam decision. The labored effort to establish the de jure-de facto concept and to overrule this constitutional principle hardly seems claculated as an exercise in semantics. It is more in the nature of judicial lagniappe for use on another day. We will know the full import of the opinions when a motion is presented to assign children on the basis of race so as to comply with what each particular movant may deem to be, in his view, a desirable racial composition for the particular school or schools. This leaves the law in a very unsatisfactory state and portends of utter confusion for school boards.[6]
 
 THE DECREE
 
 177
 The use of a uniform decree, as the majority points out, is not novel. Our school desegregation decisions have tended toward uniformity in the freedom of choice method of assignment and in the administration of such plans. A uniform decree within the limits of minimum standards would aid school boards and the district courts but the uniform decree entered in this case can be faulted because of its detail. This comes about through the unbounded aim of the court to track the HEW guidelines. It must be remembered that decrees may have to be enforced by the court and a court should guard against being put in the unfeasible position of having to hear motions based on the alleged breach of some minor and insubstantial provision of its decree. It is also not clear to me that sufficient latitude is left to the district courts to adjust such practical difficulties as may arise under the detail of the decree.
 
 
 178
 HEW has an advantage over the district courts, as the court has now restricted them, in the execution of school desegregation plans. HEW may delay, excuse, and change. HEW may vary its requirements as between systems. The majority has left no such power in the district courts. They are admonished to follow HEW but it is a sad day for the district courts, and for the entire judiciary as well as for the principle of separation of powers when the only discretion left them is within the limits to be set by HEW.
 
 
 179
 It also would appear improper to constitute the courts as overlords of the school systems of this circuit to the extent done in the uniform decree. The district courts must require school equalization to the extent set out in paragraph VI of the decree. Its scope is only a short step from taking over curriculum. The building improvement provision moves the courts in the direction of levying local taxes. Ordering school boards to discontinue the use of buildings could amount to taking property without due process and just compensation. These are drastic measures and there are no facts before the court to demonstrate the necessity for them. It is entirely proper for the District Court to disapprove new construction where it will perpetuate the dual school system but this is a matter for complaint and hearing rather than for advance supervision as is required under VII of the decree.
 
 
 180
 By way of summation, I reiterate that the majority opinions are unfair to the extent that they discover or establish and then rely upon the de jure-de facto divisive sectional theory. The opinions expand, without constitutional authority, the requirement that dual school systems be converted into something more than unitary school systems: to-wit, that substantial integration be achieved in the respective school systems. This added requirement is itself impermissibly vague as a standard without further delineation. The opinions unduly restrict personal liberty to the extent that compelled integration is approved or required, and in this regard improperly overturn and expand the settled meaning of the Fourteenth Amendment. The court errs in prematurely holding that the guidelines issued by HEW are constitutional and within the scope of the Civil Rights Act of 1964. No guidelines whatever were considered by the district courts. Some of those approved had not been written.
 
 
 181
 My own view is that the law makes no such requirement as the majority of the court imposes. No such radical departure is necessary to accomplish what the Supreme Court has directed the lower courts to accomplish-- the elimination of the dual school system. The Supreme Court has not said that every school must have children from each race in its student body, or that every school room must contain children from each race, or that there must be a racial balance or a near racial balance, or that there be assignments of children based on race to accomplish a result of substantial integration. The Constitution does not require such. We would do well to 'stick to our last' so as to carry out the Supreme Court's present direction. It is no time for new notions of what a free society embraces. Integration is not an end in itself; a fair chance to attain personal dignity through equal educational opportunity is the goal. My view, however, is now lost in this court; hence this DISSENT.
 
 
 182
 COLEMAN, Circuit Judge (separate opinion).
 
 
 183
 These cases remind me of what Mr. Chief Justice Chase said in State of Texas v. White:[1]
 
 
 184
 'We are very sensible of the magnitude and importance of this question, of the interest it excites, and of the difficulty, not to say impossibility, of so disposing of it as to satisfy the conflicting judgments of men equally enlightened, equally upright, and equally patriotic. But we meet it in the case, and we must determine it in the exercise of our best judgment, under the guidance of the Constitution alone.'
 
 
 185
 This Court, exercising only such appellate jurisdiction as Congress has seen fit to confer upon it, confronted solely by a question of how best to preserve an already settled Constitutional right, should be guided by the Constitution alone and by nothing else.
 
 
 186
 No one denies that to an incalculable degree the future of this Country depends inescapably upon the continued, constantly improved education of all its inhabitants. Nor can it very successfully be denied that the vest practical hope of attaining this objective is to be found and maintained in the public schools. It became plain over a hundred years ago that private schools did not and could not reach the masses of the people.
 
 
 187
 Compulsory discrimination in the public schools, founded on race or color, is Constitutionally dead. No Judge would dispute this. Existentially it is like the wounded animal which bounds on for awhile after it has been fatally shot. The critical problem now is that we must not wreak irreparable injury upon public schools while executing the sentence of death against compulsory segregation. Thoroughly realizing this, the Supreme Court left the details of the eradication to the sound judicial discretion of the District Courts, subject only to appellate review. To this day this assignment has not been changed. I do not suppose in our form of government that it could be changed. Courts alone make binding adjudications on questions of Constitutionality, and litigation must begin at the District level.
 
 
 188
 The public schools of the Nation, not just those of a particular section, are now caught up at the second battleground, legal and political, not about the death of unlawful discrimination but about who and how many of any particular race shall go to any particular school with how many members of some other race. If one looked only at the great volume of litigation and its accompanying strife and publicity he would jump to the conclusion that nothing matters but the racial composition of any educational facility. This is pursued regardless of the real preferences, exercised, in genuine freedom, of those directly involved, that is, those who must have an education. In the ultimate this could become a great tragedy for those most affected. An educational house divided against itself may have trouble standing. It certainly cannot operate with maximum effectiveness.
 
 
 189
 In the light of these considerations, as one who was able to secure an education solely because there was a public school in which there was an opportunity to obtain it, I shall now express my views, as one Judge of this Court, individually, as to the decision now about to be rendered.
 
 
 190
 In doing so, I proceed upon the thesis that there is nothing at all inconsistent about being, at the same time, both a loyal American and a Southerner. I think Andrew Jackson conclusively settled that point over a century ago.
 
 
 191
 It is particularly unfortunate if our decision in these cases is in any way to be grounded on old scores against the States of this Circuit. This is contrary to American legal tradition; it opens old wounds, rekindles old fires, and lends itself as a weapon to the futile cause of further intransigency. Prior to 1954, racially separate, if equal, schools had not been condemned as unconstitutional. One is not to be punished or harassed for an act which was lawful when it was done. Indeed, such condemnation in this instance would inferentially include some of the most highly respected Judges who ever graced the Supreme Court. They had opportunities to condemn the system but, in the exercise of perfect judicial integrity, did not. As I understand it, an Omnipotent God does not change yesterday when it is past and gone. Certainly this Court cannot do it. We are now concerned with rectifying the errors of the present and forestalling, if we can, the anticipated errors of the future. I decline to participate in any ex post facto condemnations. I prefer to believe that this Court is not deliberately doing so.
 
 
 192
 I further believe that whatever the Fourteenth Amendment requires of any State it requires of all States. If we are requiring something here in the enforcement of Fourteenth Amendment rights that should not be required of all fifty States then we have exceeded our authority and we have misapplied the Constitution. I agree with the action of the majority opinion in disclaiming any intention of passing on the validity of educational operations in other Circuits. That matter is not and cannot be before us.
 
 
 193
 It is out of regard for the desirability of Constitutional uniformity that I agree, in principle, with the attempt to formulate a decree for the future guidance of District Courts in this Circuit. It is obvious that such a decree cannot adjudicate cases in advance of a hearing in the District Court, nor can it be applied in the absence of factual justification.
 
 
 194
 The decree speaks for itself, of course, but I interpret it to deal at this point with making freedom of choice a reality instead of a promise. I do not understand that this Court has abandoned freedom of choice, if that choice is real instead of illusory.
 
 
 195
 Nor do I understand it to direct that there shall be a specified percentage of the various races in any particular public school or that there shall be proportional representation of the races brought about by arbitrary order. I agree with Judges Gewin and Bell that the opinion strongly portends such a possibility. But paragraph 5 of the en banc opinion certainly disclaims any such intention. The District Courts are left free to consider all the evidence, including racial attendance percentages, in determining whether the children of any particular school district have been offered a reality instead of a shadow. It is to be anticipated that the bridge will later have to be crossed when we come face to face with a situation wherein there can be no doubt of the freedom but the results are displeasing and are attacked solely for that reason.
 
 
 196
 I think it all boils down to this. We once had the doctrine of separate but equal. We did not, I am sorry to say, pay much attention to the 'equal'. We now have freedom of choice. As Judge Bell so splendidly states it, we are now going to have to make certain of the 'freedom'. To fail in this is to invite other action which at this time I regard as unconstitutional but which could soon be made Constitutional.
 
 
 197
 The decree is not as I would have written it had I been charged with sole responsibility for the effort. No offense is intended when I doubt that it is perfect. For example, the en banc opinion says that 'boards and officials administering public schools in this circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system'. Yet II (o) of the decree prohibits any official from influencing parents or students in the exercise of a choice. In other words, if the officials feel that Negro children should be encouraged to apply for admission to a formerly white school they are prohibited from doing so. They are to be condemned, on appearances, if no Negro child chooses to attend a formerly white school; they are not allowed, in the exercise of ordinary freedom of speech, to discuss the matter with Negro children with a view to their exercising a preference in favor of attending a school they have not formerly attended. The school official cannot win. In one breath he is told to act; in the next he is immobilized.
 
 
 198
 Experience will hone away these inconsistencies and impossibilities. This Court has drafted uniform decrees on prior occasions. These are now speedily outmoded, if not abandoned. Judges, like other human beings, do not always write in granite; they often find that they have only marked in the sand.
 
 
 199
 Since the HEW guidelines were not the subject of a hearing in the Courts below I do not discuss them here. In my view, they are not now before this Court.
 
 
 200
 The focal point of the whole matter is the action of the en banc opinion repudiating Briggs v. Elliott and overruling our prior opinions which followed the same rationale, see Footnotes 1 and 2 for the citations.
 
 
 201
 It is my view that these prior cases were correctly decided. Other Circuit Courts in this Country appear to feel likewise. If the reasoning in these overruled cases is incorrect then we simply face the following:
 
 
 202
 The freedom of the Negro child to attend any public school without regard to his race or color, first secured in the Brown cases, is again lost to him after a short life of less than thirteen years. He is left open to a future adjudication that although he does not with to attend School A and has in fact expressed a desire to go elsewhere this is of no importance. Because of his race he can be assigned to a particular school to achieve a result satisfactory to someone who probably does not even live in the district but who wishes to make a racial point. Thus the child reenters the same racial discrimination from which he escaped so short a time ago. He remains bogged in race. Moreover, when Negro children are to be selected by someone, we know not who, to comply with such a racial assignment, on what basis will the selection be made? How will the wishes of some be respected and others rejected, solely because they happen to be of the Negro race? We are not freeing these children of racial chains. We are compounding and prolonging the difficulty.
 
 
 203
 The true answer remains, give him absolute freedom of choice and see to it that he gets that choice in absolute good faith.
 
 
 204
 In conclusion, I wish to say that in my own case a burning desire to obtain an education in the face of impossible circumstances is not a theoretical experience encountered only by others. I did not have an opportunity to attend school until I was eight years of age. The delay was quite unavoidable; there simply was no school to attend at that particular time. My mother taught me how to read and write, to add and subtract. My total sympathies are with the cause of education freely available to all. This, of course, under the Constitution requires no special privileges for any group or segment of the population. I regret that where once the concern was for schools to attend we now have so much strife about the details of utilizing those so readily available.
 
 
 205
 What I have said herein is with the greatest deference for my Brethren who think otherwise. We must and shall continue to work together according to our individual judgments of the law. The en banc decision may portend more problems ahead than we have heretofore encountered.
 
 
 206
 I concur in the reversal of the Judgments, Below, but my views of the issues generally are as herein set forth.
 
 GODBOLD, Circuit Judge (dissenting):
 
 207
 I respectfully dissent. I wish not to delay appellate procedures if any of the parties desire to pursue them. Therefore, I am recording my dissent at this time and will file a dissenting opinion at a later date.
 
 GODBOLD, Circuit Judge (dissenting):
 
 208
 I recognize and oppose the inequities of state-enforced and state-encouraged racial discrimination in the operation of public schools. I respect the energy, labor and intellect that judges of this and other courts have given in the past twelve years toward solution of such inequities. I understand, and share, the desire to chart a future course having fewer difficulties and frustrations. Nevertheless, although the decrees appealed from must be reversed, I dissent from the opinion and the decree.
 
 
 209
 Because this dissent is late-filed and numerous points have been discussed in the other dissenting opinions, I shall limit this opinion to only a few of the grounds on which the majority opinions, in my view, are both incorrect constitutionally and inappropriate as a matter of judicial administration.
 
 
 210
 * In the critical area of student assignment the majority propose an unconstitutional condition on the operation of a valid freedom of choice system, violative of equal protection and of due process. This court has deemed freedom of choice[1] an acceptable method for a school board to use in fulfilling its duties. Singleton II, 355 F.2d at 871. HEW recognizes it as a permissible means of desegregation. 1966 Revised Guidelines, Subpart B, 181.11; also Subpart D. A substantial part of the majority opinions and the attached decree are directed at setting out requirements of a free choice plan that is truly free and unfettered. But the majority superimpose upon free choice, even though in all respects fairly and validly set up and administered, a condition subsequent that the statistical results of racial mixing[2] produced by the freely-made choices must be acceptable under standards imposed from outside those making the choice. They do this by establishing as a constitutional requisite that a free choice system must produce a degree of student racial mixing, not yet defined as to limits but nevertheless required.
 
 
 211
 The United States reads the language of the majority in this vital area as mere dictum. In brief on rehearing the government says: 'The appellees, in petitioning for rehearing, asserted that the decision of the panel held that the Constitution imposes an absolute duty to achieve a racial mixing of students so as to eliminate a disproportionate concentaration of Negroes in certain schools within a system. Once this proposition is asserted, the appellees have no difficulty in disparaging the opinion as being inconsistent with prior holdings of the Fifth Circuit. It is true that the panel indicated its concern that educational opportunities on an equal basis be furnished to all, and the opinion does suggest in a footnote that elimination of the all-Negro school makes this objective easier to obtain. But the appellees misread the opinion when they claim that this is the holding of the Court.' I wish that I could read the majority as saying no more than that disproportionate racial concentration of students is evidentiary of whether a freedom of choice system is truly free, or share with confidence the view that the teeth of the original opinion are extracted by paragraph 5 of the en banc opinion. I am not able to do so. If the language of mandatory mixing is indeed a mere aside we shall all await with interest to see whether the courts are the prisoners of their own slogans and the dictum of today is to be asserted as the law of tomorrow.
 
 
 212
 The majority define 'integration' and 'desegregation' as conversion of a de jure segregated dual school system to a unitary, nonracial (nondiscriminatory) system-- students, faculty, staff, facilities, programs, and activities, this for the objective of offering equal educational opportunities for all.[3] There are two strings to the bow of this definition. To convert a dual system into a unitary, non-racial system the student body is one of the arms of the system which must be converted. Second, the equal educational opportunity that must be offered is elsewhere in the opinion equated with a racially mixed education.
 
 
 213
 The majority state firmly that the law does not require racial balance, or a 'maximum of racial mixing', nor that each and every child shall attend a racially-balanced school,[4] and that Guidelines are not to be used to establish racial 'quotas.' Percentage figures in the Guidelines may be rules of thumb as the majority say. It may develop that neither the courts nor the Commissioner of Education will seek to achieve racial balance by the Guidelines or otherwise. But all this is irrelevant to the consitutional issue. Grasping the irrelevancy requires understanding that 'racial balance' is a word of art referring to a ratio of Negro and white students in approximately the same proportions as Negro and white population of the community or of the schools. It is proposed that governmental action must produce a degree of racial mixing less than 'racial balance' but, by someone's standards, sufficiently mixed to produce 'equal educational opportunity,' even though free choices by students and their parents have produced a contrary or lesser result.[5] Despite disclaimers of specific figures and of racial balance, power to require mixing is reserved within a range, a hazy range to be sure but nevertheless existent.[6] If the Commissioner and the courts constitutionally have no power to require racial mixing superimposed on a valid free choice system, constitutionality is not conferred by the premise that they will not employ the power to the extent of 'racial balance' but are free to roam at will in requiring mixing to a lesser extent.[7]
 
 
 214
 The theory that under a free choice plan statistical imbalance alone rises to constitutional dimensions was discarded by the Eighth Circuit in Clark v. Board of Education of Little Rock, 369 F.2d 661, 666 (8th Cir., 1966).[8] See also Deal v. Cincinnati Board of Education, 369 F.2d 55, 62 (6th Cir. 1966):
 
 
 215
 'The mere fact of imbalance alone is not a deprivation of equality in the the absence of discrimination.
 
 
 216
 'Bare statistical imbalance alone is not forbidden.
 
 
 217
 'Appellants' right to relief depends on a showing of more than mere statistical imbalance in the Cincinnati schools.'
 
 
 218
 That school desegregation cases are class actions does not add any validity to the idea of a required Mixing result.[9] It may be that 'The right of the individual plaintiffs must yield to the right of Negroes as a class.'[10] But the majority do not stop there. They create the rule that the freely-exercised choice of all individual members of the class must yield to the 'right' of the class if exercise of choice has not produced a result agreeable to the standard of a supervising aughority (judicial or administrative). But 'there is nothing in the Constitution which prevents his (everyone's voluntary association with others of his race or which would strike down any state law which permits such association. The present suggestion that a Negro's right to be free from discrimination requires that the state deprive him of his volition is incongruous.' Bradley v. School Board of City of Richmond, 345 F.2d 310, 316 (4th Cir., 1965). See also, Olson v. Board of Education, 250 F.Supp. 1000, 1006 (E.D.N.Y.), appeal dismissed as moot, 367 F.2d 565 (2d Cir., 1966); 'Nor did it (Brown) decide that there must be coerced integration of the races in order to accomplish educational equality for this also would require an appraisal of the effect upon the hearts and minds of those who were so coerced.'
 
 
 219
 It is asserted that freedom of choice is a privilege or means not itself reaching constitutional dimensions, as though this is an answer to whether once conferred the exercise of it may be aside. The concern is not merely whether individual privilege must give way to an overriding constitutional right, but whether individual privilege conferred upon the beneficiaries of the right as an acceptable means of meeting the constitutional requirement, and validly exercised, must give way. Exercised free choice is a benefit, and student and parents may not be deprived of that benefit on racial grounds.
 
 
 220
 Once exercised the choice is one of associates. The constitutional depths of freedom to select associates are not yet fully explored.[11] 'No one can doubt that freedom of association, as a basic mechanism of the democratic process, must receive constitutional protection, and that limitations on such a fundamental freedom must be brought within the scope of constitutional safeguards.' Emerson, Freedom of Association and Freedom of Expression, 74 Yale L.J. 1 (1964). Professor Emerson points out that associational rights are not derived solely from the first amendment but are implied in the whole constitutional framework for the protection of individual liberty in a free society. The right of freedom of association most frequently comes up in the context of the power of government to regulate the affairs of a group or association, NAACP v. State of Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), but arises also in other contexts, including the area where the associational rights are not organizational but personal in nature. It is this context which Professor Wechsler believed was the primary, but overlooked issue in the early school segregation cases. And Professor Emerson notes, 'In this situation-- an official proscription of personal association-- the right to associate in its literal meaning comes nearest to being an absolute right untouchable by government power.'
 
 
 221
 The collision is head-on between individual freedom and paternalistic authoritarianism. No more invidious discrimination, or improper government objective, can be imagined than national power setting aside the valid exercise of choice by members of a class in the name of the constitutional objective for which the choice was granted to the class in the first place.
 
 
 222
 The cut horizontally and vertically into American life of what the majority postulate is breathtaking. There are many means by which the Negro is moving out of established patterns of segregation and entering the full current of American life. To meet the constitutional objective of juries not racially discriminatory acceptable machinery must be established to place on the jury rolls Negroes qualified for jury service. Brooks v. Beto, 366 F.2d 1 (5th Cir., 1966). In the name of the standard are Negroes (and whites too) constitutionally forbidden to exercise excuses or avail themselves of other means valid and acceptable to them of avoiding actual service?11A Whether Negroes are entitled to move, and wish to move, from the back of the bus is one thing; whether the power of the state is to be employed to require them to move is another. We need not speculate on the mathematical probabilities of what the exercise of choices may produce in any of these areas of life (though there is implicit in the majority position the feeling that under a valid free choice system not enough Negroes will make the choice to produce the defined goal of equal educational opportunity.) The constitutional problem is not founded in probability but power and duty of governmental authority to act regardless of probability.[12]
 
 II
 
 223
 Expressions by this court of the validity and constitutionality of the 1966 Guidelines were wholly inappropriate. Because of the context and manner of that action no one can say with assurance or exactness what has been decided, what is open, and what is subject to re-examination.
 
 
 224
 Each of the seven cases before us was pending on the docket of this Court before the 1966 Guidlines were promulgated. These Guidelines were not involved in any manner in the cases when litigated in the district courts, and the parties had no opportunity to raise by normal judicial procedures and methods questions of their constitutionality and their consistency with the 1964 Act, to draw the issues and develop evidence thereon.
 
 
 225
 The Guidelines were brought into these cases for a limited purpose. The Court asked counsel to comment by supplemental briefs on the extent to which it is permissible and desirable for the courts to give weight to guidelines, and if permissible and desirable to suggest means to make them judicially effective (Opinion, Footnote 13). From this proper inquiry for comment of counsel on matters of judicial power and policy the majority have vaulted to premature pronouncements of compliance with statutory policy and to unprecedented and almost offhand statements on complex constitutional questions of vital significance to millions of our citizens.
 
 
 226
 It is a non sequitur that a court is empowered to act on a constitutional question not before it for decision on the ground it feels it should, for no court would ever do so without such feeling. The doctrine of constitutional restraint is not to restrain courts that do not want to act but those that do and to protect them from the very forces and circumstances that engender a sense of urgency, create a compulsion to act and serve to rationalize action after the event.
 
 
 227
 For reasons whose soundness is beyond argument the doctrine of restraint in passing on constitutional issues is engrained in our jurisprudence. 'grave constitutional questions are matters properly to be decided by this Court but only when they inescapably come before us for adjudication. * * * only by such self-restraint will we avoid the mischief which has followed occasional departures from the principles which we profess.' United States v. Rumely, 345 U.S. 41, 48, 73 S.Ct. 543, 547, 97 L.Ed. 770, 776-777 (1953).[13] This circuit consistently has recognized and honored the principle. See e.g., Gibbs v. Blackwell, 354 F.2d 469, 471 (5th Cir., 1965); Connor v. New York Times Co., 310 F.2d 133, 135 (5th Cir., 1962).
 
 
 228
 The Court succumbed to the temptation to reach all issues within its sight and thereby present a total package-- complete, neat and with all corners square. Already it was well-established that the Guidelines are of great weight and are minimum standards. If they were to be made judicial standards in a more formal sense they could have become so subject to a determination of their constitutionality and statutory authorization at a proper time and under appropriate judicial procedures.[14] The millions affected by them are entitled to no less, nor are the public officials who must administer them, the school officials who must seek to implement them, the citizens who are assisted by them, and the courts who are to give weight to them.
 
 
 229
 The position of the United States itself exemplified that validity and constitutionality of the Guidelines were never in issue. At p. 56 of its brief for the en banc rehearing the United States said:
 
 
 230
 'The appellees' briefs argue at considerable length that the Guidelines violate the Civil Rights Act of 1964. The North Carolina Board of Education, as amicus curiae, requests that the Court not consider the question of the 'validity' of the Guidelines, urging that that question is not here in issue. We agree that that issue is not technically before the Court. But the question of whether the Guidelines are an appropriate guide for effective relief in a Fourteenth Amendment case is before the Court. We believe that they are, and that the Guidelines conform to Fourteenth Amendment Standards.'
 
 
 231
 It is especially unfortunate that the en banc court should have discussed validity and constitutionality at a time when there was pending before a three-judge court in the United States District Court for the Middle District of Alabama, Alabama NAACP State Conference of Branches, et al., and United States of America v. Lurleen Burns Wallace as Governor, et al., and John W. Gardner, as Secretary of Health, Education and Welfare of the United States, and Harold Howe II, as United States Commissioner of Education, 269 F.Supp. 346 (M.D.Ala., 1967), which had been tried, briefed, argued and was under submission awaiting decision.
 
 
 232
 In that case the constitutionality of the 1966 Guidelines had been squarely raised, a record developed,[15] and the application, effect, operation and validity of the 1966 Guidelines litigated at length, including the difficult question of presidential approval. The United States had waived sovereign immunity to the extent of consenting that Secretary of Health, Education and Welfare Gardner and Commissioner Howe be made parties defendant for the purpose of litigating these important questions. Secretary Gardner and Commissioner Howe appeared and admitted jurisdiction.
 
 
 233
 The mischief of failure to exercise requisite judicial restraint was exemplified when 2457-N was decided on May 3, 1967, for that court considered constitutionality and validity to be already decided by this Court, and a decision based on appropriate pleadings, proof and consideration was foreclosed.[16]
 
 
 234
 In my view the expressions by this Court on both constitutionality and validity were substantively erroneous. But that is immaterial to the matter of how vital questions are properly considered and determined.
 
 
 
 [1]
 'In the South', as the Civil Rights Commission has pointed out, the Negro 'has struggled to get into the neighborhood school. In the North, he is fighting to get out of it.' Civ.Rts.Comm.Rep., Freedom to the Free. 207 (1963)
 This Court did not 'excuse' neighborhood schools in the North and West which have de facto segregation. No case involving that sort of school system was before the Court.
 School segregation is 'inherently unequal' by any name and wherever located. But de facto segregation resulting from residential patterns in a non-racially motivated neighborhood school system has problems peculiar to such a system. The school system is already a unitary one. The difficulties lie in finding state action and in determining how far school officials must go and how far they may go in correcting racial imbalance. In such cases Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) may turn out to be as important as Brown. A broad-brush doctrinaire approach, therefore, that Brown's abolition of the dual school system solves all problems is conceptually and pragmatically inadequate for dealing with de facto-segregated neighborhood schools.
 We leave the problems of de facto segregation in a unitary system to solution in appropriate cases by the appropriate courts.
 
 
 [2]
 This distinction was first expressed in Briggs v. Elliott, E.D.S.C.1955, 132 F.Supp. 776: 'The Constitution, in other words, does not require integration. It merely forbids discrimination.'
 
 
 [3]
 Avery v. Wichita Falls Independent School District, 1956, 241 F.2d 230; Borders v. Rippy, 1957, 247 F.2d 268; Rippy v. Borders, 1957, 250 F.2d 690; Cohen v. Public Housing Administration, 1958, 257 F.2d 73; City of Montgomery, Ala. v. Gilmore, 1960, 277 F.2d 364; Boson v. Rippy, 1960, 285 F.2d 43; Stell v. Savannah-Chatham County Board of Education, 1964, 333 F.2d 55; Evers v. Jackson Municipal Separate School District, 1964, 328 F.2d 408; Lockett v. Board of Education of Muscogee County, 1965, 342 F.2d 225
 
 
 [1]
 'The opinion' and 'the decree' as used herein refer to the opinion and decree filed in these cases by the three judge panel on December 29, 1966, wherein two of the judges agreed and one dissented. Of necessity, references to page numbers of the opinion refer to the slip opinion
 
 
 [2]
 See Gayley, The Classic Myths, (Rev.ed.1939) page 23
 'She sprang from the brain of Jove, agleam with panoply of war, brandishing a spear and with her battle-cry awakening the echoes of heaven and earth.'
 
 
 [3]
 However, compare the doctrine of the majority and the theme of an article in the Virginia Law Review entitled 'Title VI, The Guidelines and School Desegregation in the South', bu James R. Dunn. Virginia Law Review, Vol. 53, page 42 (1967). According to footnote 85 of the law review article, the majority opinion was released 'as this article was going to press.' Mr. Dunn is Legal Adviser, Equal Educational Opportunities Program, United States Office of Education, HEW, Washington, D.C
 
 
 [4]
 At one place in the opinion pseudo de facto segregation in the South is mentioned, but it is asserted that any similarity between pseudo de facto segregation in the South and actual de facto segregation in the North is more apparent than real. (p. 68)
 
 
 [5]
 The case of Blocker v. Bd. of Educ. of Manhasset, N.Y. (E.D.N.Y.1964) 226 F.Supp. 208 cited and relied on by the majority does not support the de facto-de jure distinction. In fact Judge Zavatt disavows any such distinction. The following is from the opinion:
 'On the facts of this case, the separation of the Negro elementary school children is segregation. It is segregation by law-- the law of the School Board. In the light of the existing facts, the continuance of the defendant Board's impenetrable attendance lines amounts to noting less than state imposed segregation.' 'This segregation is attributable to the State. The prohibitions of the Fourteenth Amendment 'have reference to actions of the political body denominated a State, by whatever instruments or in whatever modes that action may be taken. * * * Whoever, by virtue of public position under a State government, * * * takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.' Ex Parte Virginia, 100 U.S. 339, 346-347, 25 L.Ed. 676, 679 (1880). 'The situation here is in no different posture because the members of the School Board and the Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment, they stand in this litigation as the agents of the State.' Cooper v. Aaron, supra, 358 U.S. (1), at 16, 78 S.Ct. (1401), at 1408, 3 L.Ed.2d 5.'
 
 
 [6]
 See for example the following statements from the opinion:
 'The courts acting alone have failed.' (p. 847 of 372 F.2d). 'Quantatively, the results were meager.' (p. 853) 'And most judges do not have sufficient competence-- they are not educators or school administrators-- to know the right questions, much less the right answers.' (p. 855). 'In some cases there has been a substantial time-lag between this Court's opinions and their application by the district courts. In certain cases-- which we consider unnecessary to cite-- there has even been a manifest variance between this Court's decision and a later district court decision. A number of district courts still mistakenly assume that transfers under Pupil Placement Laws-- superimposed on unconstitutional initial assignment satisfy the requirements of a desegregation plan.' (p. 860)
 
 
 [7]
 See item (5), page 855 of the opinion:
 '(5) But one reason more than any other has held back desegregation of public schools on a large scale. This has been the lack, until 1964, of effective congressional statutory recognition of school desegregation as the law of the land.'
 
 
 [8]
 See opinion, page 848 of 372 F.2d, footnote 13
 It should be noted that when the panel which originally heard this case invited briefs no mention was made of any constitutional question or issue with respect to the HEW guidelines. Rather, the questions posed related to whether it was 'permissible and desirable' for the court to give weight to or rely on the guidelines; and if so, what practical means or methods should be employed in making use of the guidelines. From the questions raised by the court, counsel could not have gained the impression that the court was to make a full scale determination of the constitutional questions involved.
 
 
 [9]
 See opinion page 857
 
 
 [10]
 The 1966 Guidelines were promulgated on March 7, 1966, after these cases were docketed in this Court. The fact that the appellees had no opportunity to have a hearing and that the guidelines were unilaterally issued without receipt of evidence from the numerous school districts was called to the attention of this Court by one of the briefs for appellees:
 'As pointed out in detail below, the Constitutional and legislative principles applicable to the expenditures of federal funds, the legislative and administrative discretion placing conditions upon the receipt and use thereof, the lack of due process in the adoption thereof and the lack of any opportunity to be heard by those affected thereby all render such Guidelines inapplicable to the pending cases.' 'The 1966 Guidelines (as well as the 1965 Guidelines) were not approved by the President. They were issued by the Office of Education unilaterally without an opportunity for the representatives of the thousands of school districts affected thereby to be heard. As unilateral directives they have not been subject to judicial review.'
 See consolidated brief Jefferson County Board of Education, pp. 76-77.
 
 
 [11]
 One of the leading and most recent cases on jury exclusion is Swain v. State of Alabama (1965) 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. With respect to proportional representation on juries the Court concluded:
 'Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury roll from nor on the venire or jury roll from which the petit jurors are drawn.' (p. 208, 85 S.Ct. p. 829.)
 Further, the Court in Swain quoted with approval the following statement from Cassell v. State of Texas, 339 U.S. 282, 286-287, 70 S.Ct. 629, 631, 94 L.Ed. 839, 847:
 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.'
 
 
 [12]
 Bell v. School City of Gary, Indiana, 213 F.Supp. 819 (D.C.1963)
 
 
 [13]
 See opinion page 881
 
 
 [14]
 See the very clear dissenting opinion of Judge Cox
 
 
 [1]
 Suetonius, The Lives of the Twelve Caesars, (Random House, 1959), p. 191, 192
 
 
 [2]
 Even While these cases were pending after en banc argument, HEW announced new guidelines. Now for a school system to receive approval without further investigation, it must show that the number of minority group students in integrated schools within the system in the school year 1967-68 will be double the number present in 1966-67 and in some instances triple the number. New Orleans Times-Picayune, March 16, 1967, page 1, Column 4, Associated Press
 
 
 [3]
 The practice of hearing appeals in school cases on old records is very unsatisfactory. We do not know what changes in desegregation plans may have been made in the interim. It is a rapidly changing public area where plans as well as the law are in flux. Cf. Calhoun v. Latimer, 1964, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288, where the court took note of a supervening plan and remanded for an evidentiary hearing in the District Court
 
 
 [4]
 Section 602 of Title IV of the Civil Rights Act of 1964, 42 U.S.C.A., 2000d-1 provides that no rule, regulation or order of HEW shall become effective unless and until approved by the President. Whether the guidelines are such rules or regulations cannot be decided without an evidentiary hearing concerning their meaning through application. This question has never been put in issue in these cases
 
 
 [5]
 The legislative history of the Civil Rights Act of 1964 does not show that Congress acted on a de jure-de facto basis. I would not attribute such a form of sectionalism to the Congress
 
 
 [6]
 A good example of the problems to be encountered in eliminating the dual school system is to be seen in the Taliaferro County, Georgia school system. See Turner v. Goolsby, S.D.Ga., 1965, 255 F.Supp. 724, for background. There were only two schools in the systems and the board desegregated, effective in September 1966, on the basis of converting the white school into an elementary school and the Negro school into a high school. A perfect racial balance would be accomplished under the plan. In 1965 there were approximately 600 Negro children and 200 white children enrolled in the system. The records of the Georgia State Department of Education as of January 19, 1967 indicate that there are now 527 Negro students enrolled in the Taliaferro County school system and no white students. This result raises serious questions. How is a 'plan that works' to be formulated for this school system? What number of white students will be needed to make it work? Where will they come from? How will they be selected? Will a lottery system be used? Will they be compelled to attend the taliaferro County school system? If so, how? Will the taxpayers of the system be compelled to pay for educating children brought in from outside the system? Will the court ignore system lines although the laws of Georgia provide for separate school systems? What measures will be employed to avoid resegregation through families removing their residences from the school system? Granted this is an extreme example but it is nevertheless a factual situation
 
 
 [1]
 7 Wall. 700, 720, 74 U.S. 700, 720, 19 L.Ed. 227 (1868)
 
 
 [1]
 Throught this opinion 'freedom of choice' and 'free choice' refer to a plan validly set up, properly administered, and with choices freely exercised without external pressures, so that the plan itself (as opposed to the statistical results produced by exercised choices) is in all respects constitutionally acceptable
 
 
 [2]
 The term 'racial mixing' is used with intent that it be neither laudatory nor denigrating of the process and the individuals involved, but as a simple descriptive phrase that avoids further confusing use of 'integration' and 'desegregation.'
 
 
 [3]
 Footnote 5 of majority opinion, 372 F.2d at 846-847
 
 
 [4]
 Ibid
 
 
 [5]
 For example:
 'As the Constitution dictates, the proof of the pudding is in the eating: the proof of a school board's compliance with constitutional standards is the result-- the performance. Has the operation of the promised plan actually eliminated segregated and token-desegregated schools and achieved substantial integration?' 372 F.2d at 894.
 'If school officials in any district should find that their district still has segregated faculties and schools or only token integration, their affirmative duty to take corrective action requires them to try an alternative to a freedom of choice plan, such as a geographic attendance plan, a combination of the two, the Princeton plan, or some other acceptable substitute, perhaps aided by an educational park. Freedom of choice is not a key that opens all doors to equal educational opportunities.' 372 F.2d at 895-896.
 En Banc Opinion: 'In fulfilling this (affirmative) duty it is not enough for school authorities to offer Negro children the opportunity to attend formerly all-white schools. The necessity of overcoming the effects of the dual school system in this circuit requires integration of faculties, facilities and activities, as well as students.' 380 F.2d at 389.
 Other language is somewhat less mandatory in terms, as statements that mixing of students is a high priority goal and that disproportionate concentrations of Negroes cannot be ignored. But when the opinion is carefully read racial mixing is not set out as a desirable objective but as a constitutionally required result.
 
 
 [6]
 Perhaps the range is 'substantial integration' as used by the Civil Rights Commission. See n. 5 of majority opinion. 372 F.2d at 846-847
 
 
 [7]
 Significant testimony from HEW officials was given in Alabama NAACP State Conference of Branches et al. and United States of America v. Lurleen Burns Wallace, Governor, and John W. Gardner, as Secretary of Health, Education and Welfare of the United States, and Harold Howe II as United States Commissioner of Education, Case No. 2457-N, decided by a three-judge court on May 3, 1967 (Middly District of Alabama). 269 F.supp. 346
 As I read that testimony HEW considers it unlikely that a fairly operated free choice plan will fail to produce transfers in numbers that it deems sufficient. But that under 181.54 of the 1966 Guidelines the best indicator of whether the plan is working is the extent of transfers from segregated schools. That a low rate of, or lack of, transfers may lead to an administrative examination of operation of the plan, which might result in a determination that the plan is not being properly operated. That 181.11 authorizes the Commissioner to determine the conditions under which a free choice plan is not acceptable.
 There is other HEW testimony that if a school system employed a free choice plan, administered in a non-discriminatory manner in every respect, and no Negro chose transfer to a white school and no white student chose transfer to a Negro school, there would be a 'technical violation' of the 1966 Guidelines and the system regarded as not in compliance. (Whether this is likely to occur is not the question. We are concerned with the scope of power, not the withholding of exercise of it.)
 
 
 [8]
 'Though the Board has a positive duty to initiate a plan of desegregation, the constitutionality of that plan does not necessarily depend upon favorable statistices indicating positive integration of the races. The Constitution prohibits segregation of the races, the operation of a school system with dual attendance zones based upon race, and assignment of students on the basis of race to particular schools. If all of the students are, in fact, given a free and unhindered choice of schools, which is honored by the school board, it cannot be said that the state is segregating the races, operating a school with dual attendance areas or considering race in the assignment of students to their class rooms. We find no unlawful discrimination in the giving of students a free choice of schools. The system is not subject to constitutional objections simply because large segments of whites and Negroes choose to continue attending their familiar schools. It is true that statistics on actual integration may tend to prove that an otherwise constitutional system is not being constitutionally operated. However, these statistics certainly do not conclusively prove the unconstitutionality of the system itself.'
 'In short, the Constitution does not require a school system to force a mixing of the races in school according to some predetermined mathematical formula. Therefore, the mere presence of statistics indicating absence of total integration does not render an otherwise proper plan unconstitutional.'
 
 
 [9]
 I do not comment in detail on the majority's proposition that cases having to do with procedures for enforcement of rights and the exhaustion of administrative remedies are now to be treated as substantively creating class rights to constitutional entitlements previously considered to be valued rights of individuals. Instead I deal primarily with the additional question of whether the alleged class right can override or swallow up individual right to equal protection. 'It is the individual who is entitled to the equal protection of the laws.' McCabe v. Atchison, etc., 235 U.S. 151, 161, 35 S.Ct. 69, 71, 59 L.Ed. 169 (1914)
 
 
 [10]
 The class is defined as all Negroes in a school district attending an inherently unequal school. If equal educational opportunity includes the right to a racially-mixed education with mandatory mixing if not otherwise attained, it is not clear why the class stops at district lines. Stopping at the district line is a convenient device for administration and for procedural purposes in litigation but wholly irrelevant to the quantum of constitutional entitlements
 
 
 [11]
 See Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 33 (1959), referred to by the majority. 'For me, assuming equal facilities, the question posed by state-enforced segregation is not one of discrimination at all. Its human and constitutional dimensions lie entirely elsewhere, in the denial by the state of freedom to associate * * *.'
 And at 73 Harv.L.Rev. 34: 'If the freedom of association is denied by segregation, integration forces an association upon those for whom it is unpleasant or repugnant. Is this not the heart of the issue involved, a conflict in human claims of high dimensions * * *. Given a situation where the state must practically choose between denying the association to those individuals who wish it or imposing it on those who would avoid it, is there a basis in neutral principles for holding that the Constitution demands that the claims for association should prevail?
 11A In a criminal case against a Negro defendant the exercise by the white prosecutor of peremptory challenges so as to strike Negro jurors is not in a particular case a violation of equal protection. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). If the Negro defendant, by like exercise, removes Negro jurors is his action subject to scrutiny?
 
 
 [12]
 Nor would the basic constitutional defect be remedied by an approach along the following line: that choice is exercised annually, and if required standards of mixing are not attained in one year the free choice plan itself might be declared unacceptable for the next year. To deprive of free choice because, on the basis of prior choices, it is feared that a required level of mixing will not be attained in the next year is no less invidious than retrospectively vitiating exercise of choice that did not produce the demanded ratio
 Let it be emphasized that here, as elsewhere, the words 'ratio' and 'required racial mixture' and words of like import do not necessarily represent a figure exact in a mathematical sense, but the range-- whatever it may be-- less than the 'racial balance' which the majority and HEW say they will not attempt to reach but insufficient to qualify as 'equal educational opportunity.' It requires no special gift of prophecy to foresee that the range will center on the suggested percentages of the Guidelines.
 
 
 [13]
 'Only an adjudication on the merits can provide the concrete factual setting that sharpens the deliberative process especially demanded for constitutional decision.' United States v. International Union United Auto, etc., Workers, 352 U.S. 567, 591, 77 S.Ct. 529, 541, 1 L.Ed.2d 563 (1957)
 'We have consistently refrained from passing on the constitutionality of a statute until a case involving it has reached a stage where the decision of a precise constitutional issue is a necessity. * * * Many questions of a statute's constitutionality as applied can best await the refinement of the issues by pleading, construction of the challenged statute and pleadings, and, sometimes, proof.' United States v. Petrillo, 332 U.S. 1, 5 and 6, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947).
 
 
 [14]
 There is no way for a court to properly decide as an abstraction whether the Guidelines are such rules, regulations or orders as do not become effective until approved by the President (as required by 602, Title VI, Civil Rights Act of 1964, 42 U.S.C.A. 2000d-1). There must be a hearing at which there is evidence on the scope of their application
 
 
 [15]
 The parties called 16 witnesses, submitted 40 depositions and filed approximately 800 pages of briefs. A substantial part of all this related to constitutionality of the Guidelines and whether they conformed to the intent of the 1964 Act
 
 
 [16]
 'After extensive briefing and full argument, the Court of Appeals for the Fifth Circuit in United States v. Jefferson County Board of Education, 372 F.2d 836, decided December 29, 1966, rehearing decided en banc March 29, 1967, 380 F.2d 385, has held that the 1966 HEW Guidelines are 'within the scope of the congressional and executive policies embodied in the Civil Rights Act of 1964.' (372 F.2d p. 857.) Again the Court said: '* * * we hold that HEW's standards are substantilly the same as this Court's standards. They are required by the Constitution and, as we construe them, are within the scope of the Civil Rights Act of 1964.' (p. 848.) On en banc rehearing, the Court reiterated: 'These Guidelines and our decree are within the decisions of this Court, comply with the letter and spirit of the Civil Rights Act of 1964, and meet the requirements of the United States Constitution.' (P. 389 of 380 F.2d.)
 'These holdings were made deliberately and advisedly in the face of contentions that the validity of the 1966 Guidelines was not in issue. The Court ruled otherwise, holding that the courts should rely heavily upon the Guidelines and should model their standards after those promulgated by the executive (372 F.2d p. 852), and that 'these Guidelines establish minimum standards clearly applicable to disestablishing state-sanctioned segregation.' (opinion on en banc rehearing p. 389 of 380 F.2d.)' Alabama NAACP State of Conference of Branches, et al., v. Wallace, 269 F.Supp. 346, 350 (M.D.Ala., 1967).